

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MKB:AEG/SD
F.#2007R02181

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

December 1, 2009

**By Hand and ECF**

The Honorable Sterling Johnson, Jr.
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

       Re:   United States v. Thomas Archer <u>et al</u>.
            <u>Criminal Docket No. 08-288 (S-1)(SJ)</u>

Dear Judge Johnson:

       The government respectfully submits this letter to address the issues raised at the hearing held in the above-referenced case on November 19 and 23, 2009.  For the reasons discussed below, the government respectfully submits that the Court should grant the government's motion for the admission at trial of the videotaped deposition of Rahul Gupte and should not impose any additional remedy beyond the adjournment already granted in connection with the government's production of copies of A files to the defense.

I.    <u>The Deposition of Rahul Gupte</u>

       The Court ordered a hearing on two issues concerning Mr. Gupte's deposition: Mr. Gupte's unannounced departure from the United States after the deposition and the government's destruction of certain files. (Pre-Trial Conference, Nov. 16, 2009 ("Nov. 16 Tr.") (attached hereto in relevant part as Exhibit A) at 8-9).

    A.    <u>Gupte's Departure From the United States</u>

        1.    <u>Identifying and Deposing Gupte</u>

       Special Agent Eric Silverman of the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), testified that on October 20, 2008 he learned that Mr. Gupte had been arrested in Arizona and released on a bond by an immigration judge. (Hearing, Nov. 19, 2009 ("Nov. 19 Tr.") (attached hereto in relevant part as Exhibit B) at 16, 18).  That

same day, Agent Silverman entered Mr. Gupte's pedigree information into a computer system called TECS. (Nov. 19 Tr. at 17-18). At the time, Agent Silverman was not aware of any way to prevent Mr. Gupte from leaving the country. (Nov. 19 Tr. at 18).

On April 27, 2009, the government moved the Court for permission to take Mr. Gupte's deposition. The government argued that the deposition was warranted because at the time, Mr. Gupte, who was present in the United States without legal status, was in removal proceedings. The government had asked ICE to adjourn those proceedings to permit the witness to assist the government, and ICE had done so. Nonetheless, Mr. Gupte wanted the proceedings to go forward. He intended to accept voluntary departure and return to his home country. A trial date had not yet been set, but the government had informed Mr. Gupte that he would be expected to return for trial, and Mr. Gupte had agreed to do so. Both defendants opposed the government's motion, arguing that Mr. Gupte was not yet unavailable for trial and that they could not properly cross-examine him in advance of trial. On June 22, 2009, the Court granted the government's application to take Mr. Gupte's deposition but declined to rule on whether it would be admitted at trial, granting the government leave to move for its admission following the deposition. On August 11, 2009, Mr. Gupte was deposed. As noted in the government's November 8, 2009 letter moving for admission of the deposition, both defendants and their counsel were present throughout the deposition. In total, the government examined Mr. Gupte for 43 minutes, counsel for Archer cross-examined Mr. Gupte for 1 hour and 44 minutes, and counsel for Rafique cross-examined Mr. Gupte for 1 hour and 19 minutes.

      2.    <u>Gupte's Departure from the United States</u>

On September 14, 2009, Agent Silverman spoke to Mr. Gupte and arranged to meet him at Mr. Gupte's home the following day to serve him with a trial subpoena. (Nov. 19 Tr. at 21). Chief David Bello, of the DHS Customs and Border Protection ("CBP") Anti-Terrorism Contraband Enforcement Team testified that at 9:10 p.m. that night, Air India submitted the manifest for its Flight 140 to CBP. (Nov. 19 Tr. at 43). That flight was scheduled to depart John F. Kennedy International Airport at 9:30 p.m. (Nov. 19 Tr. at 43-44). Airlines are required to submit their manifests to CBP 30 minutes before departure, but in this instance Air India failed to do so. (Nov. 19 Tr. at 34). At 9:14, the TECS system sent Agent Silverman an automated notification informing him that Mr. Gupte was scheduled to depart that day on Flight 140. (Nov. 19 Tr. at 44). The notification did not include the time of the flight. (Nov. 19 Tr. at 44).

Agent Silverman received the notification at approximately 9:30 p.m., five minutes after the flight closed its doors. (Nov. 19 Tr. at 21, 44). The flight took off at 9:41 p.m. (Nov. 19 Tr. at 44).

### 3. Discussion

Mr. Gupte is unavailable for trial. A witness is unavailable if the proponent of his deposition testimony has been unable to procure his attendance at trial "by process or other reasonable means." See Fed. R. Evid. 804(a)(5). A witness will not be deemed unavailable if his "absence is due to the procurement or wrongdoing of the proponent of [the testimony] for the purpose of preventing the witness from attending or testifying." Fed R. Evid. 804(a). The defendants do not dispute that Gupte is presently unavailable because he has left the country and therefore is not subject to service of process.[1] See Fed. R. Crim. P. 17(e)(2) (subpoena of witness in foreign nation governed by 28 U.S.C. § 1783); 28 U.S.C. § 1783(a) ("A court of the United States may order the issuance of a subpoena requiring the appearance as a witness before it, or before a person or body designated by it, of a <u>national or resident of the United States</u> who is in a foreign country" (emphasis supplied)). The defendants also do not contend that the government procured Gupte's absence to prevent his appearance at trial.

Instead, the defendants argue that the government failed to take a variety to steps to prevent Gupte's departure from the United States, including serving him with a trial subpoena, seeking a material witness warrant, securing his immigration court bond with property, and seizing his passport either directly or through the immigration court. (Letter from Karina E. Alomar to the Hon. Sterling Johnson, Nov. 9, 2009 ("Opp."), at 5; Hearing, Nov. 23, 2009 ("Nov. 23 Tr.") (attached hereto in relevant part as Exhibit C) at 69-70, 75-76, 78-79). Serving Mr. Gupte with a trial subpoena would not have prevented him from leaving the country. The defense had the same ability as the government to ask the Court for a material witness warrant for Mr. Gupte, see 18 U.S.C. § 3144, but in any event it is not clear that the Court would have issued such a warrant, because Mr. Gupte said repeatedly that he would return for trial. The government had no authority to alter Mr. Gupte's immigration

---

[1] Gupte remains on a watch list that would trigger a notification to Immigration and Customs Enforcement if he reentered the United States. No such notification has been triggered.

3

court bond or require that the immigration authorities seize his passport. The government had no authority to seize Mr. Gupte's passport directly. Moreover, as an Indian citizen Mr. Gupte could probably have left the United States and returned to India even without a passport.

The defendants point to no decision of any court precluding the government from introducing a Rule 15 deposition at trial because it failed to take the above-mentioned steps. The cases the defendants rely on instead involve the government taking active steps to help witnesses who had been deposed leave the jurisdiction. In United States v. Mann, 590 F.2d 361, 362-63 (1st Cir. 1978), the government returned to the witness her passport and plane tickets, which had been seized when she was arrested. Id. at 366.[2] In United States v. Olivares, 1997 WL 257479, at *1-*2 (S.D.N.Y. May 16, 1997), the court held that a witness was not unavailable when, after signing a cooperation agreement with that witness, the government consented to his release on bail pending sentencing in violation of 18 U.S.C. § 3143(a)(2) and the witness later became a fugitive.

The government is unable to procure Mr. Gupte's attendance at trial "by process or other reasonable means," and his absence is not "due to the procurement or wrongdoing of the proponent of [the testimony] for the purpose of preventing the witness from attending or testifying." Fed R. Evid. 804(a). Therefore he is unavailable, and the Court should admit his deposition at trial.

B.  The Destruction of Files

The defendants argue they could not properly cross-examine Mr. Gupte because they did not have access to his applications for a C visa and for an H-4 visa. (Opp. 6). This argument is meritless. Before the deposition, the government provided the defendants with all files concerning Gupte kept by the immigration authorities. (Deposition of Rahul Gupte, Aug. 11, 2009 (attached hereto in relevant part as Exhibit D) ("Depo.") at 7, 9). Those files did not contain a C visa application or an H-4 visa application. (Depo. 8). Kim Crowell, an immigration services analyst with DHS Citizenship and Immigration Services, testified that Mr. Gupte's H-4 visa application (also known as an I-539 application) was destroyed in

---

[2] After the witness was arrested, the district court dismissed the charges against her, prompting the government to move to take her deposition. Mann, 590 F.2d at 363.

4

2007 pursuant to standard DHS policies. (Nov. 23 Tr. at 50-52). In an effort to find Mr. Gupte's C visa application, the government sought DHS files concerning Mr. Gupte's wife, Poonam Gupte, in case the application was kept in them. (Depo. 8). DHS has two files bearing the name Poonam Gupte. (Nov. 23 Tr. at 52). One of these was destroyed in 2008 pursuant to standard DHS policies. (Nov. 23 Tr. at 52-53). The government previously believed that the other Poonam Gupte file was destroyed in 2007, but in preparing for the hearing on this issue the government learned that the file still exists. (Nov. 23 Tr. at 53-55). The government has reviewed the file and determined that it relates not to Rahul Gupte's wife, but to a different Poonam Gupte. The file contains no reference to the witness Rahul Gupte. The government is aware of no other method by which the C visa application, if it exists, might be found. Therefore, nothing the government could have done would have enabled the defendants to use either application to cross-examine Mr. Gupte either at the deposition or at trial.

The defendant Thomas Archer argues that the computer record introduced at the hearing concerning Mr. Gupte's H-4 visa application contained data concerning that application that the defendants could have used to cross-examine Mr. Gupte if it had been provided to them before the deposition. (Nov. 23 Tr. at 77-78). But Archer does not explain how that data could have impeached Mr. Gupte's credibility.[3] As a result, his rights were not infringed. See United States v. Thompson, 528 F.3d 110, 121 (2d Cir. 2008) (per curiam) (rejecting claim that government failed to timely disclose alleged statements by cooperating witness that defense argued were Brady material because statements "had no exculpatory or impeachment value").

The defendants had ample opportunity to cross-examine Mr. Gupte at his deposition. Therefore, the Court should admit the deposition at trial.

II. "A" Files of the Defendants' Former Clients

On November 9, 2009, defendant Rukhsana Rafique requested a hearing as to why individuals from DHS should not be held in contempt for their conduct in connection with the production to the defense of copies of certain "A" files of the defendants' former clients. (Letter from Mildred Whalen to the

---

[3] The application was filed in 2001 and has no direct relevance to this case, so its only possible value to the defense is as impeachment material.

5

Hon. Sterling Johnson, Nov. 9, 2009 ("Contempt Mot.") at 1). On November 10, 2009, the Court denied Rafique's motion to hold DHS in contempt and ordered to DHS "to <u>immediately</u> produce to the defense team" the copies at issue. (Order, Nov. 10, 2009 (emphasis in original)). On November 13, 2009, the copies were delivered to defense counsel.[4] The evidence received during the November 19 and 23 hearing demonstrates that no further remedy beyond the adjournment already granted by the Court is necessary in connection with the copies of the "A" files.

   A.   <u>Facts</u>

        In an <u>in limine</u> motion dated December 11, 2008 and filed December 12, 2008, Archer sought to compel disclosure of the complete "A" files of his former clients. (Memorandum of Law in Support of Motion to Compel Discovery and Production, Dec. 11, 2008 ("Archer Discovery Br.") at 4). Archer argued that these files contained exculpatory information, in that they demonstrated that his former clients had committed other frauds. (Archer Discovery Br. at 4). On January 9, 2009, the government agreed to permit defense counsel to review the "A" files at its office and take notes. (Letter from Andrew E. Goldsmith to the Hon. Sterling Johnson, Jan. 9, 2009 ("Discovery Opp.") at 3, 8). The government proposed that defense requests for copies of specific documents contained in those files be addressed on a case-by-case basis. (Discovery Opp. at 3, 8).

        Between January and March 2009, both defense counsel made several visits to the government's office to review the "A" files under the supervision of government personnel. On March 16, 2009, Rafique requested copies of complete "A" files of certain of the defendants' former clients whom she contended had committed prior frauds. (Letter from Mildred Whalen to the Hon. Sterling Johnson, Mar. 16, 2009, at 2-3, 6 & Ex. B). On March 17, 2009, Archer requested copies of the complete "A" files of all of the defendants' former clients. (Notice of Motion and Motion in to Compel Production of Discovery, Mar. 17, 2009

---

[4] As discussed at the November 23 hearing, one file listed in the Court's order was recently transferred outside the New York area for use in another matter. The government expects a copy of that file to be delivered to defense counsel on December 2, 2009. Also, one file listed in the Court's order relates to an individual who did not retain the defendants. The government notified defense counsel of this fact on November 16, 2009 and defense counsel agreed that they were not entitled to a copy of that file.

6

("Archer Br.") 4, 8-10). On March 20, 2009, the government informed the Court and the defense that "the Department of Homeland Security has not authorized the government to provide copies of the complete 'A' files to the defendants" but that it would address requests for copies of specific documents on a case-by-case basis. (Letter from Andrew E. Goldsmith to the Hon. Sterling Johnson, Mar. 20, 2009, at 4).

At a status conference on June 22, 2009, the government agreed to provide the defense with copies of the complete "A" files of the defendants' former clients whom they contended had committed prior frauds.[5] On June 25, 2009, the government contacted Marguerite Mills, Assistant Chief Counsel for ICE, and informed her that it needed to provide copies of certain "A" files to defense counsel pursuant to Brady v. Maryland, 373 U.S. 83 (1963). (Nov. 19 Tr. at 63-64, 69, 71). The government also informed Ms. Mills that defense counsel had already reviewed the files. (Nov. 19 Tr. at 65-66). Ms. Mills told the government that she was concerned that the review may have violated the Privacy Act and other confidentiality provisions. (Nov. 19 Tr. at 65, 74-75). She asked Agent Silverman to deliver the files that had been reviewed by defense counsel to her so that she could determine what materials had been disclosed. (Nov. 19 Tr. at 66). Ms. Mills also informed the government that CIS, not ICE, has authority to create certified copies of "A" files. (Nov. 19 Tr. at 64).

On July 1, 2009, the Court ordered the defendants "to provide the Court with a brief summary of any pending discovery requests not previously resolved before this Court, including any Brady/Giglio requests" on or before July 10, 2009. (Order, July 1, 2009). Neither defendant filed such a summary. On July 20, 2009, the Court issued an order denying as moot the defendants' previous discovery motions and declaring that "PARTIES HAVE RESOLVED ALL DISCOVERY DISPUTES ON THE RECORD AT THE JUNE 22, 2009 CONFERENCE." (Order, July 20, 2009). The government did not understand this order to direct either it or DHS to take any action, and the government did not notify DHS that the order had been issued. Also in a letter dated July 10, 2009 and filed on July 20, 2009 after the July 20 order was issued, Archer provided the government with a list of his previous clients whom he

---

[5] The transcript of the status conference does not contain an explicit agreement. (See Status Conference, June 22, 2009 (attached hereto as Exhibit E)). Nonetheless, the government and both defense counsel understood such an agreement to have been reached.

7

believed had committed prior acts of immigration fraud. (Letter from Karina E. Alomar to Andrew Goldstein, July 10, 2009).

By approximately the third week of July, Agent Silverman had delivered all of the "A" files that had been reviewed by defense counsel to Ms. Mills. (Nov. 19 Tr. at 67). Certain of the files were labeled "Brady," but Ms. Mills did not know who had applied the labels. (Nov. 19 Tr. at 71). Ms. Mills asked the government for a list of the files that had been identified by defense counsel as Brady material. (Nov. 19 Tr. 69-71). The government provided her with that list on July 21, 2009. (Nov. 19 Ex. MM-2 (attached hereto as Exhibit F)). As soon as Ms. Mills received the list, she compared it to a spreadsheet she had created based on the above-mentioned labels "to ensure that we had an accurate accounting of exactly what files they were looking to have certified, so I could communicate that to U.S. CIS." (Nov. 19 Tr. at 71).

On July 28, 2009, the government notified Ms. Mills that in addition to copies of the "A" files identified by defense counsel, it needed to produce copies of the "A" files of its intended trial witnesses. (Nov. 19 Ex. MM-3 (attached hereto as Exhibit G)). Ms. Mills replied, "I have no problem with the release of any or all of the contents of your witness A files" with the exception of any classified and certain other material. (Nov. 19 Ex. MM-3). She noted, "Our office can provide to you copies of the files which can be turned over to defense counsel . . . ." (Nov. 19 Ex. MM-3). She added, "If you require certified copies of the files, only U.S.C.I.S. is authorized to certify the files as the custodian of the records." (Nov. 19 Ex. MM-3).

At this point, the government did not understand Ms. Mills to have indicated that she had no authority over the release to defense counsel of the "A" files they had identified. The government believed that Ms. Mills was still evaluating that potential release. Therefore, the government did not immediately place a separate request with CIS for copies of the "A" files identified by defense counsel. As noted in argument at the end of the November 23, 2009 hearing, the government acknowledges that it should have made such a request to CIS.

Also in approximately the end of July, Ms. Mills consulted with other ICE counsel, including the Office of the Principal Legal Advisor, in Washington, D.C., about the early 2009 review of the "A" files by defense counsel. (Nov. 19 Tr. at 75-76). ICE counsel decided that it would take no further action concerning that review. (Nov. 19 Tr. at 75-76). At some point soon after that decision was made, CIS Immigration Officer Mel

Shatzkamer approached Ms. Mills to discuss the certification of a copy of one "A" file. (Nov. 23 Tr. at 6, 8). Officer Shatzkamer told Ms. Mills that he was concerned about the certification of copies of files in connection with the Archer prosecution. (Nov. 23 Tr. at 6). Ms. Mills informed Officer Shatzkamer that her office had no position on certification and that he should confer with CIS counsel on that issue if he were asked to certify files. (Nov. 23 Tr. at 6-7, 10).[6]

On October 14, 2009, the government asked Officer Shatzkamer for copies of the "A" files identified by defense counsel. (Nov. 23 Ex. MS-1 (attached hereto in relevant part as Exhibit H)). The following day, Officer Shatzkamer discussed the request with Ms. Mills, who advised him that providing complete copies of the files to defense counsel would violate the Privacy Act and other confidentiality provisions. (Nov. 23 Ex. MS-1; Nov. 23 Tr. at 29, 45-46). On October 20, 2009, Officer Shatzkamer informed the government that various parts of the "A" files could not be provided to defense counsel. (Nov. 23 Defense Ex. B (attached hereto as Exhibit I)).

On November 2, 2009, Ms. Mills informed the government that she had no objection to providing defense counsel with complete copies of the "A" files they had identified. (Nov. 19 Tr. 79-81; Nov. 19 Tr. Ex. MM-4 (attached hereto as Exhibit J)). The government immediately sent Officer Shatzkamer an email asking him to create certified copies of the files, noting Ms. Mills's position. (Nov. 19 Ex. MM-4; Nov. 23 Tr. at 47-48). Officer Shatzkamer was not in the office on November 2, so he received the email on November 3. (Nov. 23 Tr. at 48).

After receiving the email, Officer Shatzkamer consulted with Jason Raphael, CIS Associate Regional Counsel. (Nov. 19 Tr. at 105; Nov. 23 Tr. at 48). Mr. Raphael advised Officer Shatzkamer that the copies of the complete "A" files could not be provided to defense counsel. (Nov. 19 Tr. at 105-06; Nov. 23 Tr. at 48-49). On November 4, 2009, Mr. Raphael informed the government that copies of the complete "A" files could not be provided to defense counsel. (Nov. 19 Tr. at 107). Mr. Raphael and the government agreed that Officer Shatzkamer would review

---

[6] Officer Shatzkamer testified that he remembered the late July conversation with Ms. Mills but could not recall whether they discussed any files other than the one that he was certifying at that time. (Nov. 23 Tr. at 25).

9

the files to determine precisely what confidentiality issues existed. (Nov. 19 Tr. at 108).[7]

On November 7, 2009, the government informed counsel for Rafique that it was having some difficulty obtaining copies of the "A" files from DHS. The government and defense counsel discussed the possibility of reaching an agreement about what evidence would be used at trial that would obviate the need for defense counsel to receive copies of the files. The parties agreed to discuss the matter further.

On November 9, 2009, Rafique asked for a hearing as to why individuals at DHS should not be held in contempt for violating the Court's July 20, 2009 or, in the alternative be ordered to provide immediately copies of the "A" files to the government for disclosure to the defense. (Contempt Mot. at 1). The government took no position on Rafique's motion for an order directing DHS to provide the files to the government but opposed Rafique's request that DHS be held in contempt. (Letter from Andrew E. Goldsmith and Soumya Dayananda to the Hon. Sterling Johnson, Nov. 9, 2009, at 1). At approximately 3:17 p.m. on November 10, 2009, the Court denied the motion for contempt and ordered DHS "to _immediately_ produce to the defense team" the copies at issue. (Order, Nov. 10, 2009 (emphasis in original); Email from ecf_bounces@nyed.uscourts.gov to nobody@nyed.uscourts.gov, Nov. 10, 2009 (attached hereto as Exhibit K)).

At approximately 3:23 p.m. on November 10, 2009, the government relayed the Court's order to Mr. Raphael. (Nov. 19 Ex. JS-1 (attached hereto as Exhibit L)). At approximately 3:33 p.m., Mr. Raphael asked Officer Shatzkamer and Agent Silverman to deliver the files to another individual in CIS whom Mr. Raphael would instruct to copy and certify them. (Nov. 23 Ex. MS-4 (attached hereto as Exhibit M)). Mr. Raphael later asked Agent Silverman's office to copy the files. (Nov. 23 Ex. MS-4).

On November 11, 2009, Veterans Day, eight ICE agents volunteered to copy the files. (Nov. 23 Tr. at 15). Although November 11 was a federal holiday, the agents did not receive overtime pay for their work. (Nov. 23 Tr. at 15). The agents used every copy machine available to them in two separate office locations, and Agent Silverman worked the entire day. (Nov. 23

---

[7] Officer Shatzkamer participated in this conversation but did not recall being instructed to review the files. (Nov. 23 Tr. at 50).

Tr. at 15-16). The copying was not completed that day, so agents returned on November 12 at 6 a.m. to continue copying. (Nov. 23 Tr. at 16). Also in the morning of November 12, the copies that had been made on November 11 were delivered to the CIS office responsible for certifying them. (Nov. 23 Tr. at 16). The remaining copies were made and were delivered to the certification office at approximately 2:30 or 3 p.m. on November 12, 2009. (Nov. 23 Tr. at 16).

At approximately 4:30 p.m. on November 12, 2009, the government asked defense counsel whether they would accept copies of the "A" files that were not certified. Defense counsel said that they would. The government immediately informed Mr. Raphael and Agent Silverman that the copies did not need to be certified and asked Mr. Raphael and Agent Silverman to "arrange with [defense counsel] a time for them to pick them up or for you to deliver them to them." (Nov. 19 Ex. JS-4 (attached hereto as Exhibit N)). By that time, the office that was certifying the files had closed for the day, so Agent Silverman directed two ICE agents to pick up the files from the certification office on November 13, 2009 and deliver them to Mr. Raphael. (Nov. 23 Tr. at 17). Mr. Raphael received the copies at approximately 11:30 a.m. on November 13. (Nov. 19 Tr. at 143-44).[8]

At about that time defense counsel for Rafique called Mr. Raphael. (Nov. 19 Tr. at 142). Mr. Raphael informed defense counsel for Rafique that she would need to arrange to have the copies picked up at 26 Federal Plaza, in Manhattan. (Nov. 19 Tr. at 140). Defense counsel informed the government that requiring her to do so was not acceptable. The government instructed Agent Silverman to deliver one set of copies to counsel for Rafique and retained a courier to deliver the other set to counsel for Archer. (Nov. 23 Tr. at 17-18). Both defense counsel received copies of the files by approximately 4 p.m. on November 13. (Nov. 23 Tr. at 18).

On November 16, 2009, the Court adjourned the trial, setting a control date of January 4, 2010.

B. <u>Argument</u>

The Court should not impose any further remedy beyond the adjournment already given because DHS promptly complied with

---

[8] Mr. Raphael testified that the copying was not completed until late in the morning on November 13. (Nov. 19 Tr. at 143).

the Court's order and the defendants will not be prejudiced by having received the copies of the "A" files when they did.

### i. Contempt

The defendants argue that DHS violated the Court's July 20 order declaring that discovery disputes had been resolved. (Contempt Mot. at 2). First, as the government argued at the hearing, it did not understand the Court's ruling to be an order directing action on the part of any government agency. Even assuming it was an order, DHS could not have violated this order. By its terms, the July 20 order did not order DHS or any other party to do anything. Second, because the government did not interpret the July 20 order as an order directed to DHS, the government did not notify DHS of the July 20 order. DHS also did not violate the Court's November 10 order. The evidence demonstrates that after the Court issued its order DHS worked as quickly as possible, including during a federal holiday, to provide copies of the files to defense counsel.

Under these circumstances, neither civil nor criminal contempt is appropriate. "A party may be held in civil contempt for failure to comply with a court order if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." <u>Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.</u>, 369 F.3d 645, 655 (2d Cir. 2004). With respect to the July 20 order, not even the first element is met, because the July 20 order did not clearly and unambiguously require DHS to take any action at all and, in any event, DHS was not notified of the order. With respect to the November 10 order, the evidence demonstrates that DHS diligently attempted to comply and in fact did comply with the Court's order as soon as DHS received notice of it.

Criminal contempt is not appropriate because to the extent that DHS did violate any order of the Court -- which the government does not believe it did -- there is no interpretation of the facts suggesting that such violation was willful. "Criminal contempt is punishable only where it is willful, that is, where it is committed with a specific intent to consciously disregard an order of the court, or where the defendant knows or should reasonably be aware he or she is in the wrong." <u>Doral Produce Corp. v. Paul Steinberg Assoc.</u>, 347 F.3d 36, 38 (2d Cir. 2003) (internal quotation marks and citations omitted). DHS was unaware of the July 20 order, and DHS personnel worked very hard

to comply with the November 10 order.  The government submits that this record does not support a finding of criminal contempt.

### ii. Dismissal of the Indictment

The Court noted at the November 16 pre-trial conference that it might dismiss the indictment. (Nov. 16 Tr. at 13). The Court should not do so. "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). First, the "A" files were not suppressed by the government -- on the contrary, defense counsel had ample opportunity to review the files at issue and to take notes about them nearly a year before the November 16 trial date.  Indeed, those notes describe in detail why defense counsel believes that each of the files at issue is relevant. (Letter from Mildred Whalen to the Hon. Sterling Johnson, Mar. 16, 2009, at Ex. B; Letter from Karina E. Alomar to Andrew Goldstein, July 10, 2009).  Second, now that the Court has adjourned the trial, defense counsel will have additional opportunity to use the copies that have been provided to them pursuant to the Court's order of November 10, 2009 to prepare for trial.[9]  The defendants therefore have not been prejudiced by the manner and timing of the disclosure of the "A" files.

\*    \*    \*

For the reasons discussed above, in the government's November 8, 2009 and November 14, 2009 letters, and on the record at the November 23, 2009 hearing, the Court should admit the video of Mr. Gupte's deposition at trial and should not impose

---

[9] Defense counsel also have additional time to review the 3500 material that the government provided to them on November 11, 2009.

any further remedy based on the manner and timing of the disclosure of "A" files to the defendants.

                                Respectfully submitted,

                                BENTON J. CAMPBELL
                                United States Attorney
                                Eastern District of New York

By:        /s/
       Andrew E. Goldsmith
       Soumya Dayananda
       Assistant U.S. Attorneys
       (718) 254-6498/7996

cc:  Karina E. Alomar, Esq. (by FedEx and ECF)
     Mildred Whalen, Esq. (by hand and ECF)