# EXHIBIT B

1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - X
3
    UNITED STATES OF AMERICA,     : 08-CR-00288(SJ)
4                                 :
                                  :
5                                 :
        -against-                 : United States Courthouse
6                                 : Brooklyn, New York
                                  :
7                                 :
                                  : Thursday, November 19, 2009
8   THOMAS ARCHER                 : 9:30 a.m.
    and RUKHSANA RAFIQUE,         :
9                                 :
            Defendant.            :
10
    - - - - - - - - - - - - - X
11
12           TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING
           BEFORE THE HONORABLE STERLING JOHNSON, JR.
13             UNITED STATES SENIOR DISTRICT JUDGE

14

15                    A P P E A R A N C E S:

16
    For the Government: BENTON J. CAMPBELL, ESQ.
17                          United States Attorney
                            Eastern District of New York
18                          271 Cadman Plaza East
                            Brooklyn, New York 11201
19                      BY:  ANDREW EDWARD GOLDSMITH, ESQ.
                             SOUMYA DAYANANDA, ESQ.
20                           Assistant United States Attorney

21

22   For the Defendant:    ALOMAR & ASSOCIATES, P.C.
                           60-89 Myrtle Avenue
23                         2nd floor
                           Ridgewood, New York 11385
24                     BY:KARINA E. ALOMAR, ESQ.

25
```

E. Silverman - Direct / Dayananda                    15

1   record

2           THE WITNESS:  Eric Silverman -- E-R-I-C,

3   S-I-L-V-E-R-M-A-N.

4           THE COURT:  You pray proceed.

5           MS. DAYANANDA:  Thank you, Your Honor.

6   DIRECT EXAMINATION

7   BY MS. DAYANANDA:

8   Q    State your name for the Court.

9           THE COURT:  He already did.

10  Q    Can you tell the Court what agency you're from?

11  A    I work for Department of Homeland Security Immigration

12  and Customs Enforcement.

13  Q    How long have you worked for ICE?

14  A    Since 2005.

15  Q    What's your title there?

16  A    I'm a special agent.

17  Q    What are some of your duties, briefly, as a special agent

18  of ICE?

19  A    I work for the Document and Benefit Fraud Task Force and

20  I investigate any kind of fraud perpetrated against the

21  Government.

22  Q    Directing your attention to April of 2007.

23           Were you assigned to investigate a case involving

24  Thomas Archer?

25  A    Yes, I was.

E. Silverman - Direct / Dayananda                16

1    Q    And as part of your investigation, did you request

2    A files?

3    A    Yes.

4    Q    From -- about how many A files did you request?

5    A    About, somewhere in 170, 175.

6    Q    Was one of those files the file of a Mr. Rahul Gupta?

7    A    Yes.

8    Q    Directing your attention to October 20th of 2008.

9         Were you contacted by ICE Counsel here in New York?

10   A    I was.

11   Q    What, if anything, did you learn regarding Mr. Gupta?

12   A    I learned that Mr. Gupta had been arrested in Tucson,

13   Arizona because his visa had expired.

14   Q    What was the result of that conversation?

15   A    The Chief Counsel's Office, the Litigation Unit, was

16   trying to get ahold of his A file that I had in my possession

17   so that they could prosecute him.

18   Q    And did you provide that A file?

19   A    No, I did not.  I held on to the A file.

20        THE COURT:  Just a second.  His visa had expired.

21        How long was the expiration?

22        THE WITNESS:  That, I don't know, Your Honor.

23        THE COURT:  All right.

24   Q    Now, when you received this phone call on October 20th,

25   2008, what in respect to your investigation did you do?

1  A     I asked the Chief Counsel for Mr. Gupta's immigration

2  attorney's name and phone number so I could put him in touch

3  with the U.S. Attorney's Office.

4  Q     Did you learn of Mr. Gupta's pedigree information?

5  A     Yes.

6  Q     What did you do with regard to the pedigree information?

7  A     I entered it into our computer system.  It's called TECS.

8  It stands for Treasury Enforcement Computer System.

9  Q     Now, can you explain to the Court what happens once you

10  enter pedigree information into this TECS system?

11  A     His information goes into a database that's linked up, in

12  this case, with whatever case file you're working on.

13        So, it would be Archer and all the people I've

14  spoken to or come into contact with regarding his case.  And

15  that information is available to ports of entry.

16  Q     Okay.  When you say "ports of entry," what do you mean?

17  A     Airports, anyplace that someone would come in or out of

18  the country.  Legally.

19  Q     Now, can you describe how this has an effect on someone

20  entering the country?

21  A     Someone entering the country typically, my understanding

22  is, that the airport the CBP, I think it is, would run their

23  names.

24        THE COURT:  What is CBP?

25        THE WITNESS:  Sorry, Your Honor.  Customs and Border

1  Protection.

2            THE COURT:  All right.

3  Q    What's your understanding on in effect, if any, on an

4  outbound person based upon the TECS entry?

5  A    On an outbound?  I don't know exactly how they work it,

6  but that information is available as well.

7  Q    What day did you enter this information?

8  A    October 20th, 2008.  The same day that Chief Counsel's

9  office called me.

10 Q    Now, did you know at that time of any way to prevent

11 Mr. Gupta from leaving the country?

12 A    No, I did not.

13 Q    Apart from entering his information into this TECS

14 system, did you take any additional steps?

15 A    No.

16            THE COURT:  Just a second, just a second.

17            Was Mr. Gupta in custody at the time?

18            THE WITNESS:  No.  He was, my understanding is that

19 he was, he was put before an Immigration judge and was

20 released.

21            THE COURT:  On bail?

22            THE WITNESS:  I believe so.  Some sort of bond.

23            THE COURT:  Okay.

24            MS. DAYANANDA:  Now, showing you what's been marked

25 as Government's Exhibit 1.

E. Silverman - Direct / Dayananda                    19

1           It's given to Counsel, Your Honor.  I have copies

2      for you.

3           May I approach?

4           THE COURT:  Go ahead.

5           (Handing.)

6      Q    Do you recognize what's been handed to you,

7      Agent Silverman?

8      A    Yes, I do.

9      Q    And what is that?

10     A    This is a subject record.  This is what I entered on the

11     20th.

12     Q    Is that the subject record for Mr. Gupta?

13     A    Yes, it is.

14     Q    And is that the information you entered into the TECS

15     system on October 20th, 2008?

16     A    It, not -- some of it's been changed since then.  It's

17     been updated.  Part of it is.

18     Q    But on that date, is that the information you entered?

19     A    This is not the, all -- there is additional information

20     that was entered at a later date as well.  It was updated.

21           The last sentence, and some of the other

22     information.  The last sentence of the remarks was entered

23     after he fled.

24     Q    As far as the pedigree information --

25           THE COURT:  Just a second.

Victoria A. Torres Butler, CRR
Official Court Reporter

E. Silverman - Direct / Dayananda          20

1          After he fled where?

2          THE WITNESS:  After he left the country.  After we

3    found out that he left the country, I updated this to indicate

4    that he had fled the country.

5          THE COURT:  Let me understand this:  You get

6    notified by Counsel's office.

7          You enter this information into the TECS system in

8    October; is that correct?

9          THE WITNESS:  Correct, Your Honor.

10          THE COURT:  There came a time after you entered this

11    information that he left the country?

12          THE WITNESS:  Yes.  When he fled the country in

13    October of 2009.

14          THE COURT:  Okay.

15          Go ahead.

16    Q    This is in October of 2008; that's correct, right?

17    A    Correct.

18          MS. DAYANANDA:  Now, directing your attention to

19    September 14th, of 2009.

20          THE WITNESS:  Yes.

21    Q    Did you learn information regarding Mr. Gupta?

22    A    In October of 2009 --

23    Q    I'm sorry, September 14th of 2009.

24    A    September 14th, I'm sorry.

25          September 14th, I contacted Mr. Gupta's Immigration

E. Silverman - Direct / Dayananda                21

1   attorney to get his phone number, and I contacted Mr. Gupta to

2   arrange a time where I could serve him with a trial subpoena.

3   Q    Did you seek speak with Mr. Gupta that day?

4   A    Yes, I did.

5   Q    And what were the arrangements made in regard to this,

6   the subpoena?

7   A    The arrangements made, were made that I would come by his

8   house early the next morning to deliver the subpoena to him.

9   Q    And what, if anything, did Mr. Gupta say about his travel

10  plans?

11  A    He, he didn't -- he said he would be there.  That he had

12  some appointment that he would cancel so he would be available

13  for me to serve him with the subpoena.

14  Q    And --

15  A    He said nothing about traveling.

16  Q    Now, later that day of September 14th, 2009, can you tell

17  the Court what happened around 9:30 in the evening?

18  A    9:30 in the evening I received a, an automated e-mail, I

19  believe it's automated, sent to me indicating that Mr. Gupta's

20  name and birth date matched a passenger leaving on an

21  Air India flight out of JFK.

22          MS. DAYANANDA:  Now, showing you what's been given

23  to Counsel, marked for identification as Government's Exhibit

24  Number 2.

25          May I approach, Your Honor?

E. Silverman - Direct / Dayananda          22

1          THE COURT:  You may.

2          (Handing.)

3    Q    Do you recognize what's been handed to you as

4    Government's Exhibit 2?

5    A    Yes, that's the, that's the e-mail I received.

6    Q    And how do you know that's the e-mail you received?

7    A    I, I recognize it.

8    Q    And what do you --

9    A    It also has the, it also has the subject record number, I

10   believe, on it.

11   Q    Is that addressed to you?  Or to your --

12   A    It was, but it's redacted.

13   Q    And is that the e-mail you received at 9:30 that evening?

14   A    Yes.

15        MS. DAYANANDA:  Your Honor, I'd like to move

16   Government's Exhibit 2 into evidence into evidence at this

17   time.

18        THE COURT:  Received.

19        (Government's Exhibit 2 was received in evidence.)

20   Q    Now, what happened once you received that e-mail at 9:30?

21   A    When I received it, I called our, I called JFK in an

22   effort to confirm that it wasn't simply a same-name type of

23   thing; that it was actually Rahul Gupta.

24   Q    Were you able to confirm that it was Mr. Gupta?

25   A    Yeah, I was able to confirm based on the middle names

1   been set for his visa overstay; is that correct?

2   A    I don't know how the judges determine or set their bonds

3   in the Immigration courts; whether or not they take that into

4   account or not.

5            So, I don't know the answer to that.

6   Q    But you made no efforts to have the bond increased or the

7   bond changed to reflect this additional criminal conduct; is

8   that correct?

9   A    I have no ability to do such a thing should -- even if I

10  wanted to.

11  Q    Is there a supervisor or an individual in your office

12  that you should -- that you would report this to had you

13  wanted there to be a change?

14  A    I don't know.  I've never done such a thing.  I have no

15  idea.

16           (Pause in the proceedings.)

17

18           MS. WHALEN:  No further questions.

19  CROSS-EXAMINATION

20  BY MS. ALOMAR:

21  Q    Good afternoon, Agent Silverman.

22  A    Is it afternoon?  It's still morning.

23  Q    Good morning.

24           Agent Silverman you working for the Department of

25  Homeland Security?

E. Silverman - Cross / Alomar          34

1   A    Yes.

2   Q    And you stated earlier that you first learned that

3   Mr. Gupta had been in custody when the Chief Counsel's office

4   notified you in October of '08, that his Immigration file had

5   been transferred from Arizona to New York; is that correct?

6   A    Yes.

7   Q    And is it correct to say that after the, you spoke to

8   Chief Counsel in October of '08, that you had several

9   conversations with Chief Counsel regarding Mr. Gupta on

10  several occasions from October of '08, until Mr. Gupta

11  departed in September of '09?

12  A    No.  That didn't happen.

13  Q    You never spoke to any -- to the trial attorney handling

14  Mr. Gupta's deportation case?

15  A    Not since that first day.  On October 20th.

16  Q    Agent Silverman, isn't it a fact that the reason that

17  Mr. Gupta's deposition was taken in August was because he had

18  already expressed a desire to return back to India?

19  A    Yes.

20  Q    And in fact, he had expressed that desire to return back

21  to India long before the September 2008 -- I'm sorry -- the

22  August 2009 deposition?

23  A    I, I don't know.

24  Q    Isn't it a fact, sir, that you notified AUSA Goldsmith

25  that Mr. Gupta wanted to depart the country?

E. Silverman - Cross / Alomar                    35

1   A    No.

2   Q    And you never notified --

3   A    I put Mr. Goldsmith in touch with Mr. Gupta's attorney

4   and they had conversations.  I did not interview him, like I

5   typically would interview other witnesses.

6         The conversations were between the U.S. Attorney's

7   Office and Mr. Gupta's attorney.  That's why I haven't had any

8   conversations with Chief Counsel, or the attorney, or

9   Mr. Gupta, other than the statements I had made.

10  Q    So, it's your position that AUSA Goldsmith first

11  became --

12        MS. ALOMAR:  Withdrawn.

13  Q    It's your position, Agent Silverman, that the reason that

14  an application was made in June of '09, to have Mr. Gupta's

15  deposition was because at that point in time Mr. Gupta's

16  attorney had relayed his client's desire to return to India to

17  the AUSA in charge of the case?

18  A    I'm not following the question.  I didn't understand what

19  you're asking.

20  Q    Okay.  Let me rephrase it.

21        Sir --

22        MS. ALOMAR:  Actually, I'll withdraw that.

23  Q    Agent Silverman, isn't it a fact that you have spoken to

24  the AUSAs -- to the U.S. Attorney's Office on various

25  occasions regarding this case?

D. Bello - Direct / Goldsmith                    42

1  system can create a record on an individual asking another law

2  enforcement official viewing that record to either do

3  something or not do something.

4  Q    What, there's some Exhibits in front of you there on the

5  table.

6         One is marked Government's Exhibit 1?

7  A    Yes.

8  Q    What is that?

9  A    This is a TECS record on a gentleman, Rahul Gupta.

10 Q    Would you characterize that as a lookout?

11 A    Yes, I would.

12 Q    There is a notation on the right side, about two thirds

13 of the way down.  The letters "QRY NTFY," and the number one?

14         What is that?

15 A    That is a notation that the originator of this record,

16 the creator, put in there requesting to be notified any time

17 this record was accessed.

18 Q    When you say "accessed," would that be by a person or by

19 a computer?

20 A    Accessed in any way.  A person or computer, yes.

21 Q    Was -- and who was the person who created this record?

22 A    This record, it states that the person was Eric

23 Silverman.

24 Q    Was he, in fact, notified pursuant to that notation that

25 you had just mentioned?

D. Bello - Direct / Goldsmith                    43

1   A    Yes, I am aware that he was notified.

2   Q    What prompted him to be notified?

3   A    The airline that Mr. Rahul Gupta was traveling on,

4   Air India 140, was required to transmit their passenger

5   manifest to Customs and Border Protection.

6            Once they did transmit that manifest, it prompted

7   the system to access this record.

8   Q    Are all airlines required to submit their manifests

9   before flights depart?

10  A    Yes, they are.

11  Q    Is there a deadline by which they're required to do that?

12  A    They're required to that within 30 minutes prior to

13  departure.

14  Q    In this instance, when was the flight scheduled to

15  depart?

16  A    Air India 140 was scheduled to depart at 9:30 p.m.

17  Q    On what day?

18  A    On September 14th, 2009.

19  Q    And in this instance, when did the airline submit its

20  manifest to CBP?

21  A    CBP received the manifest at 9:10 p.m., on

22  September 14th, 2009.

23  Q    So, Air India missed its deadline on that?

24  A    Yes, they did.

25  Q    And when was the --

D. Bello - Direct / Goldsmith                    44

1        MR. GOLDSMITH:  There's another Exhibit in front of

2   you marked Government's Exhibit 2.

3        THE WITNESS:  Yes.

4   Q    What is that?

5   A    This is the e-mail notification that was automatically

6   sent to the originator of the TECS record.

7   Q    When was that notification sent?

8   A    On September 14th, 2009, at 9:14 p.m.

9   Q    What does the notification say?

10  A    It informs the originator of, the creator of the record,

11  Eric Silverman, that passenger Rahul Gupta is reported to be

12  departing JFK Airport on Air India flight 140 on

13  September 14th, 2009.

14  Q    Does it list the time of that flight?

15  A    No, it does not.

16  Q    When did that flight, in fact, depart?

17  A    The actual departure time for that flight was 9:25 p.m.

18  Q    When you say that it departed then, what does that mean?

19  A    Departures, by airlines standards, are when the doors are

20  secured on the aircraft.

21  Q    When did the flight actually take off?

22  A    The wheels-up time for the aircraft was 9:41 p.m., on

23  that same day.

24       MR. GOLDSMITH:  Nothing further, Your Honor.

25       THE COURT:  Cross?

D. Bello - Cross / Whalen                    45

1          (Pause in the proceedings.)

2

3    CROSS-EXAMINATION

4    BY MS. WHALEN:

5    Q     Agent Bello?

6    A     Yes.

7    Q     With respect to the TECS system, you said that the

8    notification for a lookout for an alert would be sent either

9    personally or by computer; is that correct?

10   A     No, that's not correct.

11         The notification would be sent automatically via

12   computer.

13   Q     Okay?

14   A     Via e-mail.

15   Q     And you received notification of the flight manifest at

16   9:10 p.m.; is that correct?  For the Air India flight in

17   question?

18   A     The records in the TECS system indicate that CBP, the

19   agency, received the manifest at 9:10 p.m. on that day.

20   Q     Okay.  And the notification didn't go out to the agent

21   until 9:14?

22   A     According to the e-mail, he did not receive it until

23   9:14.

24   Q     Okay.

25   A     On his Blackberry or e-mail system.

Proceedings                                    62

1   given me?  Is that the same thing?

2           MS. DAYANANDA:  I hope so, yes.  I believe that's

3   the --

4           THE COURT:  It's the 3500 material?

5           MS. DAYANANDA:  Correct.  It's within that as well.

6           These, these Exhibits were also the attachments to

7   the letter filed yesterday.

8           THE COURT:  Oh.  These are the --

9           MS. DAYANANDA:  The e-mails.

10           THE COURT:  The e-mails, okay.

11           MS. DAYANANDA:  Correct.

12           THE COURT:  Okay.

13           (Witness enters and takes stand.)

14           COURTROOM DEPUTY:  Please, raise your right hand.

15   M A R G U E R I T E    M I L L S,

16           called by the Government, having been

17           first duly sworn, was examined and testified

18           as follows:

19

20           THE COURTROOM DEPUTY:  Have a seat.

21           State and spell your name for the record.

22           THE WITNESS:  My name is Marguerite Mills --

23   M-A-R-G-U-E-R-I-T-E, last name -- M-I-L-L-S.

24           THE COURT:  Okay.  You may proceed.

25           MS. DAYANANDA:  Thank you, Your Honor.

M. Mills - Direct / Dayananda                    63

1   DIRECT EXAMINATION

2   BY MS. DAYANANDA:

3   Q    Good morning, Ms. Mills.

4        Can you tell the Court your title?

5   A    My title is Assistant Chief Counsel of Immigration and

6   Customs Enforcement.

7   Q    How long have you been with ICE?

8   A    I've been with ICE since its inception, but I've been --

9   I was previously with INS and I'm coming up on 13 years.

10  Q    What are your duties as the Assistant Chief Counsel of

11  ICE?

12  A    As INS's Chief Counsel of ICE my primary duty is to

13  represent the department in immigration hearings and the

14  immigration office for immigration review.

15       Additionally, I have collateral duties, which

16  includes representing the department in the denaturalization

17  actions.  I provide support in Southern District and Eastern

18  District for denaturalization cases, bot criminal and civil.

19       I, also, do Privacy Act review and subpoena reviews

20  in my office.

21  Q    Directing your attention to June of this year.

22       Did you become aware of a case, a criminal case,

23  against Thomas Archer?

24  A    I did.  On June 25th.

25  Q    Tell the Court how you became aware of that particular

1  criminal matter.

2  A     Certainly.

3        On that date I, on June 25th, I received a phone

4  call in my office from the Assistant U.S. Attorney Goldsmith.

5  He related to me that he was in the middle of a prosecution

6  and required certified copies of the administrative files.

7  Department of Homeland Security files.  Immigration files.

8  And had gotten my name from someone else who thought that

9  maybe I can help certify the files.

10       And I explained to him that ICE has no authority to

11 certify files.  That's Citizenship and Immigration Services,

12 the keeper of the records.  They have to certify the files.

13       THE COURT:  Is that another division of ICE?

14       THE WITNESS:  It's not another division of ICE.

15       Under Department of Homeland Security, there are a

16 number of agencies.  Immigration and Customs Enforcement is

17 the enforcement agency for Immigration and Customs cases.

18       Citizenship and Immigration Services is a separate

19 agency.  That's the benefits agency.  And under the

20 regulations, they're actually the official custodians or

21 keepers of the administrative files.

22       We use the administrative files routinely for our

23 work in operations, but we don't keep the records.

24       THE COURT:  Okay.

25 Q    Where is you -- you referred to it as United States

1  Customs -- Citizenship and Immigration Services.

2          Where is that located?

3  A    Well, headquarters would be located in Washington, D.C.

4  as all Department of Homeland Security agencies would be.  But

5  there is, of course, a New York office at 26 Federal Plaza.

6  Q    Where is their New York office in relation to your

7  New York office?

8  A    Same building.  It's a Federal building with multiple

9  agencies.

10 Q    Now, in that same conversation you had with

11 AUSA Goldsmith, did you learn about the review of the files?

12 A    The review of the files by defense counsel?  In this

13 case?

14 Q    Correct.

15 A    I did.

16 Q    And what, if anything, did you do after you learned that

17 information?

18 A    I was told in that phone conversation that a defense

19 attorney had -- defense attorneys in this case had benefit of

20 review of original administrative files in their entirety.

21          That raised concerns for me that there may have been

22 some improper disclosures under The Privacy Act, or

23 legalization confidentiality, or asylum confidentiality

24 regulations.  So, I immediately reported to my line

25 supervisor, Deputy Chief Counsel Lloyd Sherman, and wrote an

1  e-mail that evening to my Chief Counsel, Theresa Pauly.

2  Q    Now, as you stated, one of your duties is to review The

3  Privacy Act reviews in these files; is that correct?

4  A    Not in these files, but we do get multiple requests from

5  law enforcement agencies for status checks on aliens, for

6  information about what's happening in cases in Immigration

7  court, and I would routinely handle those type of inquiries.

8  When it's an ICE-related.

9  Q    So, once you learned that both defense counsel had

10 reviewed these files this their entirety, did you request to

11 review the files?

12 A    I did.

13 Q    Now, I'm going to direct you to -- well.

14      When did you receive the files?

15 A    They were not received all on the same day.  I made an

16 immediate call to, I had found out from AUSA Goldsmith on that

17 June 25th, call who ICE agent was who had originally delivered

18 the files to him.

19      I made a call to him that day, that's Eric

20 Silverman.  He was out of the office.  He was out of the

21 office until the next week.

22      He started delivering the files in boxes to our

23 office in the first week in July.  That was that next week.

24 But throughout the month of July, we got files piecemeal.

25 Q    Did you receive the original files by piecemeal?

M. Mills - Direct / Dayananda                    67

1   A    Yes, we received all original files.

2   Q    Now, about how many in total did you receive?

3   A    Nearly 200.  I never had any, an official listing of

4   exactly what had been closed and what had been brought, but it

5   was nearly 200; six to eight bankers boxes of files.

6   Q    And when would you say you received all of those files?

7   A    We had received most of the files that first week in

8   July.  The last of the files were probably in the third week

9   in July.  One or two would come over, they said, oh, we got an

10  additional file here, we'll bring that over.

11  Q    And how long did it take for you to review all of those

12  files?

13  A    We, I worked with two other attorneys in my office, and

14  we did the review of the initial files in two days.  We

15  prepared a spreadsheet with -- what I was concerned with was

16  exactly what applications were in each file and who filed the

17  applications, and -- but, of course, we couldn't finish the

18  review of all of the files until we had received them all.

19         So, we were done with the complete review the day we

20  received that last file, which would have been in the third

21  week in July.

22         MS. DAYANANDA:  Let me show you what's been marked

23  for identification as Government's Exhibit MM-1.

24         It's been handed to Counsel.

25         Your Honor, may I approach?

1          THE COURT:  You may.  MM-1.

2          (Handing.)

3          THE WITNESS:  Thank you.

4          MS. DAYANANDA:  I'm handing you what's been marked

5    as MM-1.

6    Q     Do you remember that, Ms. Mills?

7    A     I do.

8    Q     And what is that I've just handed to you?

9    A     It's an e-mail -- it was copied to me, so I'd seen it

10   before -- between Special Agent Eric Silverman and AUSA Andrew

11   Goldsmith.

12   Q     And what's the date of that e-mail?

13   A     June 29th.

14   Q     And is this, in substance, with regards to delivery of

15   the files to your office?

16   A     Correct.

17   Q     And, in essence, does it state that it will be delivered,

18   essentially, the first week of July, if it says "early next

19   week"?

20   A     It says "early next week" and this is written June 29th.

21   So, I think that would be the first week in July.

22   Q     Thank you.

23         MS. DAYANANDA:  Your Honor, may I move that into

24   evidence?

25         THE COURT:  You may.

1          (Government's Exhibit MM-1 was received in

2    evidence.)

3          MS. DAYANANDA:  I'm showing you what's been marked

4    for identification as MM-2.

5          It's been given to Counsel, Your Honor.

6          (Handing.)

7    Q    What is that that's been handed to you?

8    A    It was an e-mail.

9          I had asked them, by a phone conversation of Andrew,

10   for a list of the actual files that defense wanted to have up

11   Brady because I hadn't received one until this date, and he

12   did forward me the list on July 21st.

13         It's a list of the files that have been identified

14   as potential Brady files by defense counsel.

15   Q    And is that the e-mail from July 21st, Ms. Mills?

16   A    It's dated July 21st, yes.

17   Q    Now, as a result of receiving that e-mail, did you make a

18   spreadsheet?

19   A    No.  I made the spreadsheet before this e-mail was made.

20   Was sent.

21   Q    And that's --

22   A    The spreadsheet was for our own use and we did that

23   before we reviewed the files in July.

24   Q    And is the substance of that e-mail requesting the

25   A files that had been marked as Brady by defense counsel?

1  A    I wouldn't characterize it as an e-mail requesting the

2  files.

3         It is an e-mail giving me a list of the files that

4  have been requested.  This was my, I wanted to know --

5         THE COURT:  You initiated this.

6         THE WITNESS:  I requested a list and the list was

7  given to me.

8         I don't see this as a request for the files.  I see

9  it as a provision of the list that I requested.

10 Q    Well, is it fair to say you had the files in your

11 possession as of July 21st, 2009?  Is that correct?

12 A    They were in our office, yes.

13        MS. DAYANANDA:  Your Honor, if I could move that

14 into evidence.

15        THE COURT:   Received.

16        (Government's Exhibit MM-2 was received in

17 evidence.)

18        (Pause in the proceedings.)

19

20 Q    Now, after you received the e-mail of that's been entered

21 as Government's Exhibit MM-2 what, if anything, did you do?

22 A    After I received that e-mail?  I checked it against the

23 spreadsheet that we had prepared.

24        When we received the files in our office, we never

25 had any list of the files that were, were sought, that were

M. Mills - Direct / Dayananda                    71

1   going to be sought from CIS to certify.  We merely had little

2   stickies on there that said "Brady," "Brady," and I had no

3   idea who put those stickies on there, if there was any

4   reliability to the stickies.  So, I needed the list.

5           As soon as I got the list, I checked it against our

6   spreadsheet to ensure that we had an accurate accounting of

7   exactly what files they were looking to have certified, so I

8   could communicate that to U.S. CIS.

9   Q    Did you respond back to AUSA Goldsmith?

10  A    I didn't think a response was necessary because I had

11  asked him for that list and he had provided.  I could have

12  responded "thank you," but I didn't.

13  Q    So, you took it as not a request for those files?

14  A    No.

15          MS. DAYANANDA:  Directing you to July 28th of 2009.

16  Q    Before I get into this particular e-mail, you mentioned

17  that you had a phone conversation with AUSA Goldsmith

18  regarding potential Brady materials; is that right?

19  A    Yes.

20          Are you referring to June 25th?

21  Q    Correct.

22          And you said that some of the files had been marked

23  "Brady" by Post-It notes; is that correct?

24  A    Correct.  I don't know who put the Post-It notes on

25  there, but yes, there were yellow Post-It stickers on the

1   files.  And there were some just Post-It stickers in the boxes

2   that were on no file.

3   Q    And that was when you received these files in your

4   office?

5   A    Yes.

6   Q    When you received these files in your office, did you

7   place them in any particular place?

8   A    They remained in the boxes in which they came, except for

9   the time period where we were reviewing them.  And we did our

10  review in our conference room library and that's where the

11  files remained.

12          MS. DAYANANDA:  Your Honor, may I approach?

13          THE COURT:  You may.

14          MS. DAYANANDA:  Showing you what's been marked for

15  identification as Government's Exhibit MM-3.

16          (Handing.)

17  Q    Do you recognize what's been handed to y6ou?

18  A    I do.  I wrote this e-mail.

19  Q    Can you explain to the Court that particular e-mail?

20          (Pause in the proceedings.)

21

22          MS. DAYANANDA:  I think it starts from the bottom,

23  actually, Ms. Mills.

24          THE WITNESS:  Certainly.

25  A    There was an original e-mail on July 28th, to me, from

M. Mills - Direct / Dayananda                           73

1  the AUSA Goldsmith, saying he needs to turn four -- there's

2  actually an e-mail that came before this, where he had asked

3  for particular witness files.

4          And he said -- then he sent a subsequent e-mail on

5  July 28th, saying, I originally needed to turn over four more

6  A files, these are the ones for my witnesses.

7          It's missing the second page, but it does have --

8  there should be four witness files on here.  It's missing the

9  second page.

10          MS. DAYANANDA:  I apologize, you're right.

11          (Handing.)

12          THE WITNESS:  Thank you.

13  A    And I responded back to him on July 28.

14          I wrote back to him July 28th, later that day,

15  saying I had no problems with the release of witness files

16  except for classified information, law enforcement sensitive

17  information --

18          THE COURT REPORTER:  You've got to slow down.

19          THE WITNESS:  I'm sorry.

20  A    I had no problem with him releasing his witness files

21  except for any information in the files that may be

22  classified.  I said law enforcement sensitive information or

23  attorney work-product -- meaning, attorneys in Department of

24  Homeland Security -- so long as he had a waiver of security

25  from each of the witnesses.

M. Mills - Direct / Dayananda                    74

1          I additionally told him, reminding him as I had said

2    before to him on the phone, if he requires certified copies

3    files, only U.S. CIS is authorized to certify the files as the

4    custodian of records.  And I referred him to his witness, who

5    was a CIS employee, Mel Shatzkamer, hoping he could help him

6    with the certification process.

7    Q    Now, in this particular e-mail, does it refer back to any

8    of the Brady-requested materials of the e-mail of July 21st?

9    A    No.  I responded specifically to his e-mail of July 28th,

10   asking for witness files and responded regarding those witness

11   files.

12   Q    Is it fair to say you allowed the release of those

13   particular files mentioned in this e-mail?  Is that --

14   A    It's not that I can allow the release of any files.

15   Again, my agency is not the custodian of records.  I can't

16   allow the release.

17          I said I had no problem with the release.  It's,

18   it's...

19   Q    Well, let me clarify for the Court.

20          THE COURT:  You had no problem, but you couldn't

21   authorize it.

22          THE WITNESS:  I can't authorize it, but it was -- I

23   had brought up other issues to him before in terms of

24   disclosure, asylum applications, legalization applications,

25   attorney work-product, FBI information that were in our files

M. Mills - Direct / Dayananda                    75

1   that I was concerned with their release.

2           With these, I had no problem with that.  This

3   actually had none of that information.  So, from my point of

4   view, there was no problem.  I can't authorize the release --

5           THE COURT:  Wait, wait, wait.  You're going too

6   fast.

7           THE WITNESS:  I'm so sorry.

8           I had no problem with the release.  And I reminded

9   him again that U.S. CIS has to certified these files.

10  Q    All right.

11          And at that point of that -- at the time, the end of

12  July when this e-mail -- when you sent this e-mail, you still

13  had these files; is that correct?

14  A    They were still in our office, yes.

15  Q    Okay.  Now, directing you to the end of July.

16  A    After July 28th?

17  Q    After July 28th.

18          Around the same time period, did you have a phone

19  conversation regarding these privacy issues with your

20  headquarters in Washington, D.C.?

21  A    We had a phone conversation.  I don't know that it was

22  after the 28th, but it was at the end of the July that we had

23  a conference call with our headquarters of The Office of the

24  Principal Legal Advisor, which is located in Washington, D.C.

25  Q    Now, had you reviewed all of the files that you had

1  received by that time?

2  A    We had reviewed every file that was given to us by

3  Special Agent Silverman.

4  Q    And based upon what happened in that phone conference,

5  what was the decision made by ICE?

6  A    Based on that phone conference, it was essentially the

7  opinion of ICE, that while there may have been improper

8  disclosure of some of the information in the administrative

9  records, in the A files, but that in the event that CIS --

10  that we really wouldn't do anything about that other than

11  alerting the U.S. Attorney that -- as I already had, that I

12  saw that there were potential issues.

13         It was discussed that we would address this in the

14  future in terms of the handling of our cases, and there was

15  conversation -- we would have, also, conversations with the

16  Special-Agent-in-Charge about exactly how A files are supposed

17  to be transferred, and if original A files are supposed to be

18  left.

19         But it was essentially decided in that phone

20  conversation that ICE has no standing.  CIS, if they want to

21  release the files, they can release the files.

22  Q    And who did you relay that decision to?

23  A    I relayed that to Mr. Shatzkamer of CIS --

24  Q    And --

25  A    -- who was coming to ask me for the files and whether he

M. Mills - Direct / Dayananda                77

1   could certify them.

2         I relayed that we have no further interest in the

3   files.  He can work with his own Counsel and copy them, if he

4   wants to.

5   Q    Now, just to clarify; Mr. Shatzkamer does not work for

6   ICE; is that correct?

7   A    He does not.  He works for Citizenship and Immigration

8   Services.

9   Q    Now, when you asked Mr. Shatzkamer to refer to his own

10  Counsel, who were you speaking of?

11  A    They have a number of Counsel at U.S. CIS.  And they have

12  Counsel in our building.  The, I think his title is -- the

13  Deputy of Regional Counsel is Mark Hurley.

14        But the person that I know of there that usually

15  would deal with this type of files, with this type of request,

16  for certification of the files or release of files is Jason

17  Raphael.

18  Q    Now, when you relayed this to Mr. Shatzkamer after this

19  phone conference, sometime thereafter, where did the files

20  remain at that time?

21  A    At that time, I relayed to Mr. Shatzkamer that he's

22  welcome to take the files or I could send them back up to the

23  agent.  The agent is physically located in a different

24  building in 26th Street.  We're in 26 Federal Plaza.

25  Completely defendant locations.

1          Mr. Shatzkamer said to me not to send them up to the

2     agent because if he has to certify them, they'll be in the

3     wrong building.

4          So, I said, okay, they can stay here, take them as

5     you need them.

6          And so, he came and took them throughout the month

7     of July and August.  He was taking files on a piecemeal basis.

8     He would write a request to me, I would let him into our file

9     room, he would get the files.

10    Q     "He" meaning Mr. Shatzkamer?

11    A     Mr. Shatzkamer, I'm sorry.

12    Q     Now, directing your attention to now November 2nd.

13    A     Mm-hmm.

14    Q     Did you have a phone conversation with AUSA Andrew

15    Goldsmith regarding the release of the files?  The A files?

16    A     Not regarding the release of the files because just to

17    remind you, I cannot release the files.

18          But I did have a conversation with him about the

19    A files, yes.

20    Q     And when you say you cannot release the files, just so

21    I'm clear --

22    A     Yes.

23    Q     -- that means you cannot certify the files; correct?

24          As you explained, only U.S. CIS can certify the

25    files.

M. Mills - Direct / Dayananda                    79

1   A    Correct.

2   Q    At this time, on November 2nd, some of the files are

3   still with you.

4         Is that fair?

5   A    That is fair.  Despite numerous requests to, please, get

6   them out of our office, they were still there.

7   Q    So, understanding the use of the word "release," in the

8   conversation you had with AUSA Goldsmith on November 2nd, it's

9   regarding his obtaining the files.

10        Is that fair to say?

11  A    (No response.)

12  Q    Assuming you still had the files, as I said --

13             THE COURT:  Do you understand the question?

14             THE WITNESS:  She's rephrasing it.

15  Q    You still had the files on November 2nd; correct?

16  A    Correct, most of the them.

17        Some of them had been taken over, July, August.

18  Even in October some files were taken by Agent Silverman and

19  Mel Shatzkamer.

20  Q    So, when AUSA Goldsmith requested the files, the

21  remaining files on November 2nd, what in substance did you

22  tell him?

23  A    I said that our office has no further interest in the

24  files; that he's working through Mel, to continue to work

25  through Mel to get the files.  We have no further interest in,

M. Mills - Direct / Dayananda                      80

1    in pursuing the issues specifically with these files.

2    Q    How, when you say "the issues," you're referring to the

3    privacy issues that you had first brought up with him on

4    June 25th; is that right?

5    A    It's not fully privacy issues, but it is in that vein;

6    privacy, confidentiality, release of third-agency information,

7    and attorney work-product.

8    Q    Now, is this the first time you relayed that you had no

9    objection of the release of the files to AUSA Goldsmith?

10   A    I'm trying to see how to answer that in the best way.

11            It's not, I was never in a position to object to the

12   release of the files.  I was concerned about what I saw as an

13   improper disclosure of the files.  And my role in this was

14   always to look at the files in my mind, look what possible

15   agency exposure we had because of what I saw as an improper

16   disclosure, check into what my special agent may have -- if he

17   followed procedure in terms of bringing the files over, if he

18   knew about the disclosure of asylum records and legalization

19   records that were filed by other than Mr. Archer.

20            Once that was done, I had no further interest in the

21   files.  So, there never was a point where I could release

22   files.

23   Q    And I'm -- I apologize if that's, the use of the word

24   release is confusing.

25            However, in the common use of the word, when files

M. Mills - Direct / Dayananda                    81

1    are requested; correct?  You still have the files as of that

2    time of November 2nd?

3    A    Yes.

4    Q    So, if you want to use another word, but you have,

5    physically have the files to then give to the U.S. Attorney's

6    Office?

7    A    "Release" is kind of a term of art in terms of the agency

8    releasing the files.

9    Q    And when you say you weren't in a position to object to

10   the release of the files, you voiced your concerns regarding

11   the release of the files?

12   A    Absolutely.

13   Q    You voiced it to AUSA Goldsmith?

14   A    I did.

15   Q    You voiced it to the agent, the case agent in this case;

16   correct?

17   A    I voiced my concern about the way the files had been

18   handled.

19   Q    Regarding these --

20   A    Regarding the disclosures.

21   Q    So, getting back to the question of, is this -- well.

22         November 2nd, is that the first time you relayed to

23   the AUSA that you had no objection, as it relates to these

24   privacy matters, to the release of the files?

25   A    I guess it's the first time I spoke to him about it.

M. Mills - Direct / Dayananda                    82

1  Because I was aware, as of July 30th, that he was working with

2  U.S. CIS employee Mr. Shatzkamer in obtaining the files.

3  Q    Okay.  Fair.

4        So, once the decision was made at the end of July,

5  you relayed that information to Mr. Shatzkamer; correct?

6  A    I did.

7  Q    Mr. Shatzkamer does not work for your agency.

8        He works for a separate agency; correct?

9  A    He does.

10 Q    So, from July 30th to November 2nd, the decision to

11 release the files, as it relates to these privacy issues, was

12 not related to the AUSA.

13       Is that fair?

14 A    I suppose that's fair, but my issues would never -- I

15 could never prevent -- prevent the release of these files.

16 Q    Understanding the use is a term of art.

17       THE COURT:  Let's not get carried away.  I

18 understand.  We don't have to get carried away on release.

19       MS. DAYANANDA:  I want to show you what's marked as

20 Government's Exhibit MM-4.

21       (Handing.)

22       THE WITNESS:  Yes.

23 Q    Do you recognize that e-mail?

24 A    I was copied on this e-mail, yes.

25 Q    What's the date of that e-mail?

J. Raphael - Direct / Dayananda                    104

1    DIRECT EXAMINATION

2    BY MS. DAYANANDA:

3    Q     Good afternoon.

4    A     Good afternoon.

5    Q     Please, tell the Court where you work.

6    A     I'm an Associate Regional Counsel with U.S. CIS,

7    Your Honor.

8    Q     How long have you been an Associate Regional Counsel with

9    U.S. CIS?

10   A     Since the creation of the agency in June of 2003.

11          Prior to that, I was a, an Assistant District

12   Counsel since December 1990.

13   Q     What is --

14   A     With INS.   The predecessor agency.

15   Q     Right.

16          What are some of your duties as Assistant General

17   Counsel?

18   A     I provide advice to the operating units of U.S. CIS.  I,

19   also, prepare reply briefs that are filed with the board of

20   immigration appeals in visa petitions, the forms I-130s.

21   Those are my principal functions.

22          I, also, train officers.   That's what I was doing

23   earlier in the week in Pittsburgh.

24   Q     Mr. Raphael, directing your attention to November of this

25   year.

J. Raphael - Direct / Dayananda                    105

1        Did you become aware of a criminal matter against

2   Thomas Archer?

3   A    Yes.

4   Q    Directing your attention, specifically, to November 4th,

5   2009.

6        Can you tell the Court how you became aware of this

7   matter?

8   A    Yes.

9        Your Honor, I was in my office at 26 Federal Plaza

10  and I was approached on, I think it was Wednesday,

11  November 4th, by Officer Mel Shatzkamer who is, who's an

12  employee of CIS.

13       And he works in a division of CIS, called the FPNS,

14  the Fraud Protection National Security Division and he was, he

15  was part of a, is involved in the preparation of the, of the

16  case.  I think he's going to be a witness in this case, too.

17  And he came to my office and he asked me several things about

18  the case.

19  Q    And when you say "several things," did he ask you

20  specifically about the release of A files as it relates to the

21  criminal matter of Thomas Archer?

22  A    Yes, he did.

23       Do you want me to owe elaborate?

24  Q    What was your response in regard to the release of the

25  files?

J. Raphael - Direct / Dayananda                    106

1  A    Well, specifically, he asked me whether or not '589s,

2  which are applications for asylum could be released, and

3  whether I-130 applications, which are visa petitions, could be

4  released, and whether I-140 applications, which are

5  employment-based petitions, could be released, and whether

6  things, which we call personally-identifiable privacy

7  information could be released, which is supporting

8  documentation filed in support of I-130s and I-140s, if that

9  could be released.

10 Q    I'm sorry to interrupt you.

11      What was your response to the question posed by

12 Mr. Shatzkamer?

13 A    Well, I had never seen the files, Your Honor.  And I

14 still haven't.  To date.

15      But I said that, as a general matter, that with

16 respect to the I-130s, that those are filed by United States

17 citizens.  And United States citizens are protected by The

18 Privacy Act, 5 U.S.C. 552(a).  And that that material, absent

19 a so-ordered subpoena by a judge, and there are some other

20 provision also that provide for release, but that absent that

21 specific release provisions, that it cannot be released.

22 Q    And this was relayed to Mr. Shatzkamer on that day,

23 November 4th correct?

24 A    It certainty was.

25 Q    Did he inform you he was going to the U.S. Attorney's

1   Office that day?

2   A    At the end of our conversation, yes.

3   Q    Now, as a result, did you agree to have a phone

4   conversation with AUSA Goldsmith, scheduled for 11:00 a.m., on

5   November 4th, 2009?

6   A    I forget the time, but what Mel told me is that he would

7   be going to the U.S. Attorney's Office here in the Eastern

8   District and he asked me if I would please relay the

9   information that I told to Mel, whether I would repeat that

10  info to the U.S. Attorney.  It was more information about

11  asylum and PII information as well.

12  Q    In your conversation with Mr. Shatzkamer.

13  A    Yes, there was.

14  Q    Okay.  Now, in regards to that phone conversation, were

15  you called by AUSA Goldsmith sometime on the morning of

16  November 4th?

17  A    Yes.

18  Q    Now, what was the result of that phone conversation?

19  A    Well, I, I --

20  Q    Let me clarify my question.

21        The concerns that you just explained to the Court,

22  did you explain that to AUSA Goldsmith on the phone call

23  regarding the '589s and the '130 applications?

24  A    Yes.  I repeated to -- I told Andrew Goldsmith what I had

25  told Mel; that, that that information is confidential, asylum

J. Raphael - Direct / Dayananda                   108

1    information is confidential.  That I-130 information is filed

2    by United States citizens not by aliens.

3    Q     Did AUSA Goldsmith, during that phone call, explain to

4    you why it was necessary to have these particular

5    applications?

6    A     I think, although I'm not certain at this moment, that he

7    said that -- I don't know if he told me what the theory of the

8    defense counsel was at that point.  I certainly found out soon

9    thereafter.

10   Q     Well, general --

11   A     He probably did.

12   Q     Generally, he mentioned that these are Brady materials

13   potentially; right?

14   A     Certainly, I found out.  Either then or soon thereafter.

15   Q     Now, as far as that phone conversation, was there -- was

16   Mr. Shatzkamer told to do something in regard to your

17   concerns?

18   A     Yeah.  At the end of that -- essentially, the result of

19   that phone call is that Andrew and I said that Mel and the

20   other two members of his team, at least -- and perhaps, also,

21   Mr. Silverman, the ICE agent -- should sit down, look at all

22   these files, there are a lot of files involved, and should

23   methodically go through all the material, flag it, and,

24   essentially, go through it with, in mind, what I had just told

25   Andrew about.  What should be -- what the privileges were,

J. Raphael - Direct / Dayananda                    109

1  what the confidentiality provisions are that I had gone

2  through, what should be -- what should or should not be

3  disclosed in view of what the <u>Brady</u> material was.

4  Q    And that, you wanted that to be done before he could use,

5  at the U.S. Attorney's Office, these files.

6           Is that fair?

7  A    Yes.

8  Q    Before they could be given to defense counsel; correct?

9  A    Right.  Mm-hmm.

10 Q    Now, do you know if this ever happened?

11 A    No, I don't.

12 Q    Did you ask, apart from Mr. Shatzkamer, did you know

13 whether -- did know whether this was going happen?

14 A    I asked that it be done.  I said it was important.

15 Andrew and I thought it would be done, but I don't know if it

16 was, in fact, ever done.

17           In retrospect, I don't think it was done.

18 Q    So, from Wednesday, November 4th, you asked -- you, as

19 U.S. CIS -- asked that this review be done before its release

20 to the U.S. Attorney's Office; correct?

21 A    Before its release to defense counsel, yes.

22 Q    And did you know -- the following day, November 5th, did

23 you know whether this review was being done?

24 A    No, I did not.

25 Q    Did you check on November 7th?  Friday, November 7th.

1    Q    On the telephone, did you speak to anyone regarding the

2    files were located to begin the process that you required --

3    A    I knew where they were located.  Mel told me at least a

4    week from the beginning when he first contacted me on

5    November 4, that Agent Silverman had the files, and it was

6    confirmed to me a couple of times later.  I know that

7    Agent --

8    Q    Go ahead?

9    A    I know that Agent Silverman had received my e-mail

10   request to start copying because at some point later, I can't

11   tell you when, because I haven't been in my office for a

12   week, I know that he contacted Pat White, who was the person

13   who had to certify the copies, because he sent some kind of

14   e-mail, I don't remember the details of it, he contacted her

15   or she contacted him.  The import of it was that they were

16   beginning the certification process, so I know Silverman and

17   Ms. White were in contact with each other, which confirmed to

18   me that he knew he had received my request to start the

19   copying process.

20   Q    Incidentally, does Agent Silverman work for your agency?

21   A    No, he doesn't.

22   Q    Now, I will direct your attention to Friday, November 13

23   of this year.

24        Did there come a time when you received the A files to

25   your office?

140

```
1   A    Never.

2   Q    You did not receive boxes of the A files to your office

3   the morning of Friday, November 13?

4   A    I received copies of the 65 files that were in the

5   judge's order, yes.

6   Q    Did you send those files to defense counsel?

7   A    No.

8   Q    Who sent the filings to defense counsel?

9   A    Eventually Mr. Goldsmith's office did.

10  Q    Why didn't you send those files to defense counsel?

11  A    Because I never agreed to.  I was about to call Ms.

12  Whalen, but she had to arrange to have it delivered, in some

13  way.

14  Q    You didn't -- when you say you didn't agree to, who

15  would you have agreed with?

16  A    Beg your pardon?

17  Q    Who would you have agreed with to send --

18  A    Let see.  JS-4 as it says in JS-4, please arrange with

19  them, meaning Ms. Whalen, a time for them to pick them up or

20  who you would to deliver.  So once I--.

21             THE COURT:  Just a second.

22             Didn't the order say that you were to deliver these

23  documents to defense counsel?

24             THE WITNESS:  I'm sure that is correct, your Honor,

25  but--
```

141
Raphael-cross/Whalen

1        THE COURT:  Why would have you to agree with someone

2   to --

3        THE WITNESS:  Your Honor, I would be happy to do

4   that once I had the things.  In good faith I had no objection

5   to doing that, it was never clear to me -- Mr. Goldsmith

6   never called me and say please arrange a time to actually do

7   this.  That was never clear to me.  I would have been happy

8   to do it, if it was made clear to me.  It was never made

9   clear to me.

10        MS. DAYANANDA:  I have nothing further.

11        THE COURT:  Cross.

12   CROSS EXAMINATION

13   BY MS. WHALEN:

14   Q    Mr. Raphael, I will draw your attention to Government

15   Exhibit JS-4.  I believe, you have it in front of you?

16   A    Yes.

17   Q    The second sentence, please arrange with them a time for

18   them to pick up or for you to deliver them to them.

19        That is referring to the copies of the file, is that

20   correct?

21   A    Yes.

22   Q    It was sent at 4:33 on Thursday, November 12?

23   A    Yes.

24   Q    The next sentence, a sentence in parenthesis, then it

25   says, I suppose they could Fed Ex tonight, if they don't go

Raphael-crosss/Whalen

1   out tonight they would have to be hand delivered so that they

2   would receive them tomorrow.

3        Is that in the e-mail?

4   A   Yes.

5   Q   It gives you the name and the telephone numbers of

6   defense counsel, is that correct?

7   A   Yes.

8   Q   And you received this e-mail at 4:30 on Thursday

9   afternoon, isn't that correct?

10  A   Yes.

11  Q   And by 11:30 you had not called either defense counsel,

12  is that correct?

13  A   It is, but as I said I was about to call.  You happened

14  to call me first, but I was about to call, which is what I

15  told you when you called me.

16  Q   I you don't recall a copy of your letter to Judge

17  Johnson discussing delivery was given to you--?

18  A   No.

19  Q   I'm showing you what is marked Defense Exhibit A.  Do

20  you recognize that document.

21       (Shown to witness.)

22  A   Yes.

23  Q   What is that document?

24  A   It's a copy of the letter that I Fed Ex'd to Judge

25  Johnson the day I received the order -- ordering us to copy

143

Raphael-crosss/Whalen

1   and deliver the A files.

2   Q    Judge Johnson's order is actually attached to that, is

3   that correct?

4   A    Yes.

5   Q    And in your letter you say that the process should be

6   completed by Thursday evening or early Friday, isn't that

7   correct?

8   A    I said, I anticipate that it would be, yes.

9   Q    And in fact it was completed Thursday evening --

10  afternoon at 4:30, is that correct?

11  A    No.

12  Q    Doesn't JS-4, isn't that the indication that defense

13  counsel is no longer requiring the copies to be certified?

14  A    The copying was not completed until late Friday morning.

15  Q    Did you notify anyone of that?

16  A    I think, we went through it, but I will repeat what my

17  testimony was.  Agent Heck an ICE special agent, delivered

18  the copies of the four or six boxes to my office late Friday,

19  late Friday morning, not Thursday.

20  Q    It's your testimony that the copying was not complete on

21  Thursday afternoon?

22  A    Correct.

23  Q    And you didn't call defense counsel because the files

24  were not delivered to you until 11:30 that morning, is that

25  correct?

Raphael-crosss/Whalen

1   A    Not just delivered, I was told that it wasn't ready

2   until then, because Mr. Silverman, the ICE agent knew that

3   they had to be brought to me, once it was done, because

4   everybody in this case was making that a very important

5   point.

6   Q    That the file had to be brought to you, is that correct?

7   A    Yes.

8   Q    So that you could then turn them over to defense

9   counsel, isn't that correct?

10  A    Correct.

11  Q    Now, it was your testimony earlier, getting away from

12  the files, Mr. Shatzkamer came to you on November 4th, to

13  talk to you about these fills, is that correct?

14  A    Yes.

15  Q    That was Wednesday, November 4th, correct?

16  A    I believe so, yes.

17  Q    Prior to that had Mr. Shatzkamer discussed these files

18  with you?

19  A    No.

20  Q    Prior to that date had anyone discussed these files with

21  you?

22  A    Neither the files nor this case, no.

23  Q    And when Mr. Shatzkamer came to you on November 4th, did

24  he tell you that the trial was beginning on November 16?

25  A    I don't think so, I don't remember.  I don't think he

Raphael-crosss/Whalen

1   did, no.

2   Q    At no time did he tell you there was urgency there had

3   been a delay or he had fallen down in his opening of the

4   files and turning them over to the government or defense

5   counsel?

6   A    I don't think so, no.

7   Q    It's not your recollection that you had any conversation

8   with him about the fact that this had to be done in urgent

9   and immediate manner?

10  A    No. I did find out later though that there was an

11  agreement of the U.S. attorney with you and perhaps other

12  defense counsel to turnover this discovery material as early

13  as June of '09.

14       I didn't find that out until a few days ago.

15  Q    Your testimony is that until November 4th, you had no

16  knowledge of these files having to be produced or the

17  prosecution of this case?

18  A    That is correct, Ma'am.

19  Q    Are you Mr. Shatzkamer's supervisor?

20  A    No.

21  Q    Why did he come to you?

22  A    Because I'm CIS -- one of several CIS counsel in the New

23  York district.

24  Q    Do you know if Mr. Shatzkamer went to any other CIS

25  counsel?