**EXHIBIT C**

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,    :   08-CR-288(SJ)
                             :
                             :
                             :
     -against-               :   United States Courthouse
                             :   Brooklyn, New York
                             :
                             :
                             :
                             :
THOMAS ARCHER AND            :   Monday, November 23, 2009
RUKHSANA RAFIQUE,            :   10:30 a.m.
                             :
     Defendants.             :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING
BEFORE THE HONORABLE STERLING JOHNSON, JR.
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:    BENTON J. CAMPBELL, ESQ.
                       United States Attorney
                       Eastern District of New York
                          271 Cadman Plaza East
                          Brooklyn, New York 11201
                       BY:  SOUMYA DAYANANDA, ESQ.
                          ANDREW GOLDSMITH, ESQ.
                          MARGOT BRODIE, ESQ.
                          Assistant United States Attorneys

For the Defendant:     ALOMAR & ASSOCIATES, P.C.
                       Attorneys for the Defendant -
                       Thomas Archer
                          60-89 Myrtle Avenue
                          2nd Floor
                          Ridgewood, New York 11385
                       BY:  KARINA E. ALOMAR, ESQ.

Colloquy                                5

1   need Mr. Ba Bhatti's assistance at all on Thursday.

2            So, in a spirit of cooperation, we're willing,

3   with the Court's permission, to let Ms. Sharma, the

4   interpreter assigned today, go and cover the arraignment

5   cases and come back when she's finished.

6            THE COURT:  Okay.

7            MR. GOLDSMITH:  Your Honor, if I wasn't clear, our

8   understanding is the defense is calling Officer Shatzkamer.

9            MS. WHALEN:  Yes.

10            MR. GOLDSMITH:  We're not but we've made him

11   available.

12            THE COURT:  Okay.

13            MS. ALOMAR:  Before we begin I request that Agent

14   Silverman leave the room since he will be testifying as a

15   witness.

16            THE COURT:  Agent Silverman, would you please step

17   outside.

18            MS. BRODIE:  Your Honor for the record Margot

19   Brodie for the Government.

20            Mr. Silverman is the case agent on this case

21   and --

22            THE COURT:  He's a witness, too.  Step outside.

23   You're still under oath.

24            MS. BRODIE:  Thank you.

25            ///

1  MARGUERITE MILLS

2       recalled by the Government, having been previously duly

3       sworn, was examined and testified as follows:

4  DIRECT EXAMINATION

5  BY MS. DAYANANDA:

6  Q    Good morning, Ms. Mills.

7  A    Good morning.

8  Q    To clarify your testimony from this past Thursday, you

9  testified about a conversation that you had at the end of

10 July of this year with Mel Shatzkamer; is that right?

11 A    Yes.

12 Q    Now, what was your understanding of that conversation?

13 A    The conversation at the end of July, Mel had come to me

14 about a particular file that he had been asked to certify.

15 Q    If you could speak in the mic.  I'm sorry.

16 A    I'm sorry.  Better?

17 Q    Yes.

18 A    Mr. Shatzkamer had come to me about a particular file

19 that he had been asked to certify.  He expressed some concern

20 about certification of files in the case.  And I stressed to

21 him that I had no problem with certification; that he had if

22 he were asked to certify files by the U.S. Attorney's Office

23 he needs to work through counsel to do that.

24 Q    And by counsel who did you mean?

25 A    His own counsel which would be for Citizenship and

1  Immigration Servicers CIS.

2  Q    Now, at that time, did you express your view as to

3  whether these files should be released to defense counsel?

4  A    No.  I expressed my view to him at that time that I

5  thought they were improperly disclosed previously.  I did not

6  express a view as to what should happen in the future.

7  Q    Now, on Thursday you also testified regarding a

8  spreadsheet that you had created that was given to

9  Mr. Shatzkamer; is that correct?

10  A    I DID, yes.

11  Q    When do you believe you turned that over to

12  Mr. Shatzkamer?

13  A    I incorrectly recalled I was pressed for the date on

14  Thursday and I believe I said it was at the end of the

15  summer.  It was actually Agent Silverman who I gave the

16  spreadsheet to during the summer.

17         I then had an opportunity to go back and

18  review my e-mails and I e-mailed the spreadsheet to

19  Mr. Shatzkamer around October the 10th.

20         MS. DAYANANDA:  I have nothing further, Your Honor.

21         THE COURT:  Cross.

22         MS. WHALEN:  Just one question.

23  CROSS-EXAMINATION

24  BY MS. WHALEN:

25  Q    Did the meeting with Mr. Shatzkamer came at the end of

1  the summer?

2  A    Yes.

3  Q    It's your testimony today that you didn't tell him that

4  you had no problem with the copy of files?

5  A    Just to clarify.  I wouldn't characterize it as meeting

6  with Mr. Shatzkamer.  He came to pick up a file, then he went

7  and certified it, put his own certification on it.  It was

8  more of a passing than a meeting.

9  Q    Okay.

10  A    And your question was did I not tell him that I had no

11  problem with the copying?

12  Q    I believe your testimony was on Thursday was that you

13  told him that your division or your agency was had -- took no

14  position with respect to -- or I believe had no objection to

15  the copying and release of the files, although personally

16  did.  But you had cleared it with your Washington group, they

17  had no objection; and my understanding from last Thursday was

18  that you told Mr. Shatzkamer that your agency had no

19  objection to the copying of the file?

20  A    No, our agency had no objection.  And upon request, if

21  you were asked to copy it, he can work through his counsel.

22  He was nervous about being asked to copy and certify that one

23  particular file.

24  Q    Right.

25  A    And so I wanted him to be assured that he should work

1   with his own counsel when asked to copy files and certify

2   them.

3   Q    Okay.

4              But in that July -- at that conversation at

5   the end of July, that was what again told him:  That your

6   agency had -- did not object to it.

7              Just to confirm your conversation with

8   Mr. Shatzkamer at the end of July was consistent with your

9   testimony on Thursday; that your agency had no objection to

10  copying of the files and you advised him that he should speak

11  to CIS legal counsel before copying the files?

12  A    Yes.  Our agency was no longer interested in what was

13  going to happen with these files in the future.

14  Q    Okay.

15             MS. WHALEN:  No further questions.

16             THE COURT:  Counsel?

17             MS. DAYANANDA:  Just to clarify.

18  REDIRECT EXAMINATION

19  BY MS. DAYANANDA:

20  Q    The conversation regarding the files at the end of July

21  that you had with Mr. Shatzkamer, what file was that

22  conversation about?

23  A    He came to me specifically about I wish I could remember

24  the name or "A" Number.  But it was one particular file he

25  was being asked to certify.  It might have been it started

1  Shafique [sic] or something.  I'm sorry, I don't remember.

2  We were speaking about that particular file.  He was nervous

3  about copying that and certifying that file and I just said,

4  "If you're asked to certify and copy files, go through your

5  counsel."

6              MS. DAYANANDA:  Thank you.

7              THE COURT:  Okay.

8              MS. WHALEN:  I'm sorry.

9  RECROSS-EXAMINATION

10 BY MS. WHALEN:

11 Q    Just to clarify.  You were only speaking about one

12 individual file, you weren't speaking about the files that

13 the defense had requested?

14 A    In that particular conversation, that we were speaking

15 about, I spoke to Mel twice.  So, in that time period,

16 because he picked up a file.  He dropped some off, he picked

17 them up again.

18              So, there were two conversations, but in that

19 chain I think he was asking me about that particular file.

20 Should he certify this?  Should he do this?  I insisted that

21 I speak he speak to his own counsel.  He said, "What are you

22 all going to do about what's happened?"  And I said, you

23 know, we have no further interest in these files and what's

24 happened with these things, it's all up to you now.

25 Q    Okay.  And your understanding when he said and with

1   what's happened he was referring to the files that the

2   defense had requested?

3   A    I don't know at that point if he knew that the defense

4   had requested certain files.  But he definitely knew the

5   defense had reviewed files.

6   Q    Okay.

7              And then you testified that or you're saying

8   today that you had two conversations with Mr. Shatzkamer?

9   A    Right.

10  Q    So, one was with a particular file?

11  A    Right.

12  Q    And then one was with the list of files that the defense

13  had requested or just the defense request in general to copy

14  files?

15  A    It wasn't about a list.  I don't even know, to be

16  honest, if Mr. Shatzkamer was aware of a specific request for

17  more than file that he was copying at that time.  But he was

18  definitely aware at that time that I had been concerned that

19  the defense had reviewed almost 200 files.

20  Q    Okay.  So, he knew about the review at that point?

21  A    Yes.  He definitely did.

22  Q    He knew that your agency had raised concerns about the

23  review?

24  A    He did.

25  Q    And that you explained to him that, based on your

1   ERIC SILVERMAN,

2        called as a witness, having been previously duly

3        sworn, was examined and testified as follows:

4             THE COURT:  Swear the witness in.  He was sworn in

5   before.

6             MS. DAYANANDA:  He testified on Thursday.

7             THE COURT:  Okay.  You're still under oath.

8             THE WITNESS:  Yes, Your Honor.

9             THE COURT:  I'm sorry.

10  DIRECT EXAMINATION

11  BY MR. GOLDSMITH:

12  Q    Agent Silverman, on November 10, 2009, did you become

13  aware of an ordered in this case by Judge Johnson?

14  A    Yes.

15  Q    How did you become aware of it?

16  A    I was sent an e-mail from Jason Raphael from CIS to

17  counsel's office with the order attached to it.

18  Q    Do you remember when that was?

19  A    It was around 4:30 in the afternoon.

20  Q    What did you understand the order to require?

21  A    The order required that we copy 65 "A" Files completely

22  and get them certified and get them over to defense counsel.

23  Q    What did you do after receiving that order?

24  A    I contacted my supervisor, told him about the order.  He

25  contacted his supervisor and an e-mail was generated and sent

E. Silverman - Direct/Mr. Goldsmith          15

1   out to my office for people to come in on Veterans Day to

2   photocopy "A" Files.

3   Q    Was Veterans Day the following day?

4   A    Veterans Day was the following day.

5   Q    What was the response to that e-mail?

6   A    Well, the e-mails looking for volunteers and the people

7   were told that they would not be getting overtime and

8   eight --

9           THE COURT:  They would not?

10          THE WITNESS:  Would not be get overtime.

11  A    And eight agents volunteered to help me out.

12  Q    So then what happened after that?

13  A    Went in Veterans Day, I think was Thursday, Thursday

14  morning at 6:00 in the morning at 26 Federal Plaza.  We went

15  through the "A" Files and divvied them up.  My supervisor

16  came in as well to help me out and I sent agents up to 26th

17  Street where there were additional copy machines and some of

18  us stayed on 26 Federal Plaza and we utilized every copy

19  machine that the Office of Investigations has in their

20  possession.

21  Q    Which day the week was that Veterans Day?

22  A    Veterans Day was Thursday, I believe.  Am I wrong?  Or

23  Wednesday?

24          MS. WHALEN:  We'll stipulate it was Wednesday.

25          THE WITNESS:  Sorry.

1   Q    What was the status of the copying at the end of day on

2   Wednesday?

3   A    At the end of the day on Wednesday, which is I left at

4   5:30 in the evening, we had 25 files left to copy.

5   Q    What happened the following day?

6   A    Came in again.  Agents came in at 6:00 in the morning

7   and continued copying the remaining 25 files.  In the

8   morning, I had sent two agents to 26 Federal Plaza with the

9   files that had been copied as of that point to bring them

10  down to the fourth floor of CIS so that they could start

11  certifying while we're continuing to copy the remaining "A"

12  Files.

13  Q    You've referred to agents a couple of times are these

14  ICE special agents?

15  A    Yes.  This was inclusively ICE, no other office was

16  assisting us at all.

17  Q    Okay.

18            And I believe you were saying on Thursday you

19  had some delivered to the fourth floor in the morning?

20  A    Correct.

21  Q    Then what happened after that?

22  A    Then we finished the copying around, I think, it was

23  about 2:30 or 3 o'clock and we brought the remaining "A"

24  Files to the fourth floor of 26 Federal Plaza to be certified

25  as well.

1   Q    What happened after that?

2   A    They stayed there and then I received an e-mail from

3   your office from you, I believe, indicating that defense

4   counsel does not no longer requires the files to be

5   certified; that we can turn them over uncertified.

6            This e-mail was not until somewhere between

7   4:30 and 5:00 and CIS fourth floor was closed at this point

8   so we could not get the "A" Files until the next morning.

9   Q    What did you do?

10  A    I sent an e-mail to Ms. White telling her to stop

11  certification immediately and that we would pick up the files

12  first thing in the morning.

13  Q    I don't think you mention Ms. White before?

14  A    Ms. White is the supervisor of CIS who does the

15  certifications for CIS on the fourth floor.  And the next

16  morning, I sent two agents again to the fourth floor to pick

17  up the "A" Files, put them together with the ones that had

18  already been certified because some were certified at this

19  point and some were not.

20            That was first thing in the morning again and

21  they brought them to CIS Chief Counsel so that they can

22  contact defense counsel that the files were ready.

23  Q    What happened after that?

24  A    The files were up on the 11th floor which is where CIS

25  Counsel was.  And defense counsel, I was told, would not pick

1   up the files, they needed them delivered.  And the amount of

2   paper involved here was not something where I could just

3   FedEx them, so I sent two agents again to pick up the files

4   and they delivered one set to, I believe, Ms. Whalen and the

5   other set was picked up by a courier sent by the U.S.

6   Attorney's Office and delivered to Mr. Archer's attorney in

7   Queens.

8   Q    Do you know approximately when the files were given to

9   defense counsel?  Copies.

10  A    I think they ultimately ended up around 4 o'clock or so.

11  I'm not sure.

12         MR. GOLDSMITH:  Nothing further.

13         THE COURT:  Cross.

14  CROSS-EXAMINATION

15  BY MS. WHALEN:

16  Q    Agent Silverman, you were aware that the defense had

17  requested copies of these files prior to November of 2009,

18  isn't that correct?

19  A    They were not requested from me, but I am aware that

20  they were requested.

21  Q    Okay.  At some point, did you speak to Marguerite Mills

22  about the copying of the files?

23  A    About the copying of them?

24  Q    Yes.

25  A    After the judge ace offered?

1  Q    No, prior to the judge's order.  Some time, like, in

2  late June or early July?

3  A    I don't know if I talked about copying them.  I talked

4  to her about whether or not they should be turned over to

5  defense counsel.

6  Q    Okay.  And her response was that she wanted to review

7  the files because she had privacy concerns; is that correct?

8  A    Yes.

9  Q    Okay.

10          And at some point, did she get back to you and

11  say her legal counsel no longer had privacy concerns or that

12  her agency was no longer raising a privacy concern about the

13  release of the files?

14  A    What she had told me was that we can give the files to

15  the U.S. Attorney's Office.  I didn't talk to her

16  specifically about the privacy because I don't really know

17  that stuff.

18  Q    Okay.

19          When did she tell you it was okay to give the

20  files to the U.S. Attorney's Office?

21  A    I don't remember.

22  Q    Was it in November of 2009 or prior?

23  A    No, it was prior to that.

24  Q    Would you guess the end the summer or later?  Would you

25  estimate, not guess.

M. Shatzkamer - Direct/Ms. Whalen                24

1   were permitted to review certain immigration files in

2   relation to a case against the Law Offices of Thomas Archer.

3           Were you aware that defense counsel had

4   reviewed files at that time?

5   A    I'm sorry, could you please repeat the question?

6   Q    Sure.

7           In February of 2009, the defense counsel

8   reviewed certain immigration files and that their review of

9   those files was in connection with the prosecution of Thomas

10  Archer and Rukhsana Rafique.

11          Were you aware that defense counsel had

12  reviewed the files in February of 2009?

13  A    I'm not certain about the date, but I was aware that

14  defense counsel reviewed files.

15  Q    Okay.

16          And after that review, the Government agreed

17  to provide copies of certain files to defense counsel.

18          Were you aware of that?

19  A    That I wasn't aware of.

20  Q    Okay.

21          At some point, did you learn in June of, say,

22  2009 that defense counsel wanted copies of those files?

23  A    No.  Just there were files, witness files.  There was

24  one witness file, that was the only file that I was aware of

25  that was going to be provided to defense counsel.

1  Q    Okay.

2                 At some point, were you asked to deliver all

3  of the files involved in this case to Marguerite Mills?

4  A    I don't think so.

5  Q    Okay.

6                 At some point, did you learn that Ms. Mills

7  had all the files and was reviewing them for privacy

8  concerns?

9  A    I don't know if they were being reviewed for privacy

10 concerns, but I found out that all the files were within

11 Ms. Mills's department.

12 Q    Okay.

13                At the end of July, did you have a

14 conversation with Ms. Mills regarding the copying and

15 certification of files?

16 A    Only of one witness file.

17 Q    Okay.

18                Did you have any conversations with Ms. Mills

19 concerning the defense counsel review of all of the other

20 files?

21 A    I might have, I'm not certain.  I can't recall.

22 Q    Do you recall at any time Ms. Mills telling you that it

23 was okay to copy files but you should speak to your legal

24 counsel before copying them?

25 A    I might have.  I don't recall that.

1   Q     Okay.

2                At what point did you become aware of that you

3   were to copy 66 files for the defense?

4   A     I read an e-mail on November 3rd that was sent to me

5   November 2nd.  And that basically outlined that I would -- I

6   was asked to copy and certify 48 or 49 files.

7   Q     Okay.  I'm going to show you what's been marked

8   as -- what I am marking as Defendant's Exhibit B.

9                (Defendant's Exhibit E was marked for

10  identification.)

11               (Approaching the witness.)

12               (Handing to the witness.)

13  Q     I'm showing you what's been mark as Defendant's Exhibit

14  B.  Take a minute to look at it.

15  A     Mm-hmm.

16               THE COURT:  D as in dog?

17               MS. WHALEN:  B as in boy, Your Honor.  I'm sorry.

18               THE WITNESS:  Yes.

19  Q     That is an e-mail chain between -- beginning, I believe,

20  with Ms. Dayananda to you; is that correct?

21  A     Yes, it is.

22  Q     And she's alerting you -- first of all, do you recognize

23  this document?

24  A     Yes, I do.

25  Q     Okay.  And is it a copy of e-mails that were sent

M. Shatzkamer - Direct/Ms. Whalen                    28

1   A    No, we did not.

2   Q    Okay.

3             Did you speak to anyone in your legal counsel

4   about making those files?

5   A    No.  Not at that point in time.

6   Q    Okay.

7             So, on October 20th, you informed

8   Ms. Dayananda, in response to her e-mail, that you were not

9   going to be making copies of anything in the files except

10  those applications that were prepared by Mr. Archer, isn't

11  that correct?

12  A    That's correct.

13  Q    And you were informed, however, that you needed to make

14  complete copies of the files, isn't that correct?

15  A    No, it's not.

16  Q    Prior on October 15th, weren't you told that you needed

17  to make complete copies?

18  A    No, I was not.

19  Q    Okay.  I'm just going to -- okay.

20            Just calling your attention to the e-mail

21  string that's second on this list from you to Ms. Dayananda

22  on October 20th.

23            MS. WHALEN:  Your Honor, I'm just standing next to

24  the witness because I don't have a separate copy.

25            THE COURT:  All right.

M. Shatzkamer - Direct/Ms. Whalen                29

1              THE WITNESS:  I'm sorry, yes.

2    Q    Okay.

3              And she told you that she wanted the complete

4    files?

5    A    Yes.

6    Q    And your proposal was you were only going to make copies

7    of the files, copies of the files, that were applications for

8    Mr. Archer, isn't that correct?

9    A    That's correct.

10   Q    But at that point that was your decision, isn't that

11   correct?

12   A    I had -- well, I had based it on a conversation I had.

13   Q    With whom?

14   A    With Ms. Mills.

15   Q    When?

16   A    On October 15th.

17   Q    Isn't it true that Ms. Mills told you that her division

18   had no objection to the files being copied but you should

19   speak to counsel at CIS?

20   A    I don't recall that, but my conversation with Ms. Mills

21   basically advised me that if we supplied all the copies of

22   the file, we'd be in violation of the Privacy Act and the

23   Rules of Confidentiality.

24   Q    On October 15th, did you advise Ms. Dayananda of that?

25   A    Yes.  I can't recall if it was on October the 15th, but

1   shortly afterwards we advised Ms. Dayananda.

2   Q    When you say, "we," who do you mean?

3   A    I meant myself and my two associates because we had an

4   ongoing project with the U.S. Attorney's Office and we were

5   going over there any way and, you know, we would discuss it.

6   Q    Are you the individual at CIS who makes determination

7   about privacy concerns?

8   A    No, I'm not.

9   Q    Who makes those determinations?

10  A    It's CIS Counsel.

11  Q    And as of the time period from October 15th to

12  October 20th, you hadn't discussed this issue with CIS

13  Counsel had you?

14  A    No, I did not.

15  Q    October 20th to November 4th, did you discuss 24 issue

16  with CIS Counsel?

17  A    Yes, I did.

18  Q    When did you discuss with CIS Counsel?

19  A    I believe on November the 3rd or November the 2nd, I

20  can't recall.

21              Do you have -- is there an e-mail to that

22  effect?

23  Q    Let me see if I can find something for you.

24  A    Thank you.

25              MS. WHALEN:  I believe the parties are going to

1        MS. DAYANANDA:  Your Honor, if I could move this

2   into evidence at this time.

3        MS. WHALEN:  No objection.

4        THE COURT:  Received.

5        (Government's Exhibit MS-1 was received in evidence

6   as of this date.)

7   Q    It starts on the first page, Mr. Shatzkamer, on the

8   bottom.  You just referred to that as of an e-mail from

9   yourself to Ms. Mills that's dated October 15th and time

10  stamped 8:39 a.m. is that right?

11  A    Yes, it is.

12  Q    In this particular e-mail, you referred to a

13  conversation that you and your associate had with myself

14  regarding the defense counsel for 48 files; is that right?

15  A    That is correct.

16  Q    Now, in this e-mail, you say you advised myself that,

17  "Under no circumstances would the original "A" Files be

18  delivered to them," meaning, defense counsel; is that

19  correct?

20  A    That's correct.

21  Q    Now, when you --

22           When you relayed that to me, whose decision

23  was that, "Under no circumstances should they be given to

24  defense counsel."

25  A    That was the wording that I used.

1    Q    Based upon whose decision was that?

2    A    Well, I had -- I was under suspicion that a breach had

3    taken place with files that may have been sent to the defense

4    with no guardianship of the files from anyone from our agency

5    or the U.S. Attorney's Office.

6    Q    And when you learned of that, did you have a

7    conversation with Ms. Mills regarding this breach on this

8    day?

9              Let's just talk about October 15th.

10   A    I believe so.

11   Q    What was the substance of that conversation?

12   A    That the files may -- the integrity of the files may

13   have been compromised because the files were unattended by

14   anyone from our agency, ICE, or the U.S. Attorney's Office.

15   Q    What was her response regarding giving these files to

16   the defense counsel?

17   A    I can't recall.

18   Q    On October 15th?

19   A    Well, on October 15th, our conversation entailed making

20   copies of these files.  And, basically, Marguerite explained

21   the Privacy Act to me and the Rules of Confidentiality and

22   that we would be in violation of those if we turned over

23   I-30s, I-485s, if there were, in fact, any Violence Against

24   Women's Act Petitions, Religious Worker Petitions former SAW

25   applications, former legalization applications, and first and

1   foremost asylum applications.

2   Q    It was your understanding as of October 15th that the

3   "A" Files in their entirety should not be given to the

4   defense?

5   A    Yes, that's correct.

6   Q    And was that based upon the conversation that you had

7   with Ms. Mills?

8   A    Yes.

9   Q    Now, I'm going to show you what's been entered into

10  evidence as Defendant's Exhibit B.

11        MS. WHALEN:  Yes.

12  Q    Showing you what's been entered into evidence as

13  Defendant's Exhibit B.

14              Is that an e-mail from October 20th?

15  A    Yes, it is.

16  Q    Who is that e-mail between?

17  A    That's from yourself to myself.  And then, actually,

18  it's from you starting with the bottom, it's from you to me.

19  Then, I responded to you and then you responded back to me.

20  Q    Just looking at the middle portion of this e-mail on

21  Page 1, Mr. Shatzkamer, when you are replying to an e-mail

22  from the Government, you list, starting with Line 3 you say,

23  "As far as a list of what the defense will not be given."

24  A    That's correct.

25  Q    Then you list the applications that you just -- you

M. Shatzkamer - Cross/Ms. Dayananda                47

1   mentioned earlier.

2   A    Yes.

3   Q    Now, when you relayed this information, what

4   conversation are you basing this decision on?

5   A    Based on the conversation I had on October the 15th with

6   Ms. Mills.

7   Q    Showing you what's been marked for identification as

8   MS-3.

9          (Government's Exhibit MS-3 was marked for

10  identification.)

11         MS. DAYANANDA:  Your Honor, you should have a copy

12  of it.

13         THE COURT:  MS-3?  I have MS-1.

14         MS. DAYANANDA:  It might be the whole packet there.

15  I can give you another copy.

16         THE COURT:  Go ahead.  Question.

17         (Approaching the witness.)

18         (Showing the witness.)

19  Q    Showing you what's been marked for identification as

20  MS-3.

21         MS. DAYANANDA:  Here you go, Your Honor.  This has

22  been previously entered into evidence as MM-4 just so the

23  record is clear.

24  Q    Do you recognize what's been handed to you?

25  A    Yes.

1    Q    What is that?

2    A    This was an e-mail from Mr. Goldsmith to myself

3    basically advising me that it would be okay to turn over, to

4    make copies of the entire "A" File with the exception of

5    officers' notes and security checks.

6    Q    And what was the date of that e-mail?

7    A    That was November the 2nd.

8    Q    And what was your reaction when you received this

9    e-mail?

10   A    Well, I wasn't at work on November 2nd, I read it on

11   November 3rd.  And to me, this presented a complete reversal

12   of my conversation with Ms. Mills on October the 15th.

13   Q    As a result of reading that e-mail on November 3rd, what

14   did you do?

15   A    Well, at that point, I advised my supervisors that there

16   was a reversal of what would be copied and what would not.

17   And we all agreed that, at this time, we should go upstairs

18   and speak with our CIS Counsel.

19   Q    Who were the CIS Counsel?

20   A    It was Mr. Jason Raphael.

21   Q    Did you have a conversation with Mr. Raphael?

22   A    Yes, I did.

23   Q    And based on that conversation --

24              What was Mr. Raphael's reaction to the e-mail?

25   A    Well, I felt that Mr. Raphael did not want us to turn

1  over any of the -- anything other than the CSS (Newman) the

2  765 applications.

3           However, he showed me a section in the law

4  books, statute, that we could turn over at that point

5  previous SAW applications and previous legalization

6  applications, because that was the only applications where

7  they were listed in statute that we could turn those over for

8  law enforcement purposes.

9           As far as I knew, at that point, and as far as

10 our conversation, we weren't going to turn over or make

11 copies of any of the other files at that point based on my

12 conversation with Mr. Raphael.

13 Q    Now, I think you mentioned 765 applications.  You mean

14 687?

15 A    I'm sorry, 687s.

16 Q    Okay.

17           Now, from that conversation with Mr. Raphael,

18 is it fair to say that it was still your understanding that

19 the "A" File in its entirety could not be turned over?

20 A    That's correct.

21 Q    Now, during that period, did one of you suggest to have

22 a phone conference with the U.S. Attorney's Office?

23 A    Yes.  Mr. Raphael suggested that we have a

24 teleconference because we were going later that day to the

25 U.S. Attorney's Office and he requested that the U.S.

M. Shatzkamer - Cross/Ms. Dayananda                50

1  Attorneys be present and their supervisor for a conference

2  particularly about this matter.

3  Q    Now, on November 4th, were you present for that phone

4  conference?

5  A    Yes.

6  Q    What was the result of that phone conversation?

7  A    I don't believe anything had changed at that point.

8  From my understanding, in listening to it, we were going to

9  make copies but only copies of the 687s which there were

10 copies of already; and, at this time, we were going to

11 include the previous SAW applications and the previous

12 legalization applications.

13 Q    When you say nothing had changed, it's still from based

14 upon that phone conference, the "A" File would still not be

15 given; isn't that correct?

16 A    That's correct.

17 Q    Who was present for that phone confidential?

18 A    Myself, you, and Mr. Goldsmith, and the two associates

19 from my office.

20 Q    Who were they?

21 A    They were Danica Prince-Jones and Terry Shaw.

22 Q

23          MS. DAYANANDA:  Your Honor, if I approach the

24 witness.

25          THE COURT:  You may.

1              (Approaching the witness.)

2              (Handing to counsel.)

3              (Handing to the witness.)

4    BY MS. DAYANANDA:

5    Q    Who was the phone conversation with, Mr. Shatzkamer?

6    A    The phone conversation was with Mr. Raphael and yourself

7    and Mr. Goldsmith.

8    Q    And who does Mr. Raphael work with?

9    A    He's our CIS Counsel.

10   Q    Showing you what's been marked as MS-4?

11             (Government's Exhibit MS-4 was marked for

12   identification.)

13   Q    Do you recognize that, Mr. Shatzkamer?

14   A    Yes, I do.

15   Q    And what is that that's been handed to you?

16   A    This is a directive to Ms. White to make three copies of

17   "A" Files listed in the judge's order.

18   Q    Let me -- sorry to interrupt you.

19                  Why don't you start at the bottom.

20   A    Okay.

21   Q    Is that an e-mail --

22   A    It's an e-mail from Mr. Raphael to myself and to the ICE

23   agent.

24   Q    What's the date of this e-mail?

25   A    And it's dated November 10th.

1      MS. DAYANANDA:  Your Honor if I could enter MS-4

2  into evidence.

3      MS. WHALEN:  No objection.

4      THE COURT:  Received.

5      (Government's Exhibit MS-4 was received in evidence

6  as of this date.)

7  Q    Starting there the time stamp of 3:33.  In substance, is

8  that informing you of Judge Johnson's order?

9  A    Yes.

10 Q    Now, you said that e-mail was addressed to you; correct?

11 A    It was addressed to myself and to the ICE agent.

12 Q    Now, what was your reaction when you read this e-mail?

13 A    It, basically, I took this to mean that if you have the

14 "A" Files listed in the order, deliver them to Ms. White and

15 Ms. White will make copies and certify each of the copies.

16 But I didn't have the "A" Files.

17 Q    Who is Ms. White?

18 A    Ms. White is the supervisor of our Information Data

19 Entry Records Section.

20 Q    Is she in the same unit as you?

21 A    No, she's in a different unit.

22 Q    Now --

23 A    She works for CIS, though.

24 Q    What's Ms. White's unit do?

25 A    They keep records, they create "A" Files.  They ship

1   "A" Files out, they receive them.  They consolidate them.

2   They create "A" entries in our data systems.

3           MS. DAYANANDA:  Your Honor, may I approach.

4           THE COURT:  You may.

5           (Approaching the witness.)

6           (Handing to the witness.)

7           (Government's Exhibit MS-5 was marked for

8   identification.)

9   Q    Showing you what's been marked as MS-5.

10          Do you recognize that e-mail?

11  A    Yes.

12  Q    Is that an e-mail from November 10th where you're one of

13  the recipients on it?

14          THE COURT:  Just a second.  What is MS-5?

15          THE WITNESS:  Your Honor, MS-5 is a series of

16  e-mails.  The bottom is an e-mail with -- advising of your

17  order.  Then there's an e-mail from Mr. Raphael to Ms. White

18  and cc'ing myself, the ICE agent, Mr. Peter Gregory, I don't

19  know who that is, and the AUSA.  And then there's a response

20  from Ms. White to all concerned and then a thank you from

21  Mr. Raphael to Ms. White.

22          MS. DAYANANDA:  Your Honor, may I enter MS-5 into

23  evidence.

24          THE COURT:  You may.

25          (Government's Exhibit MS-5 was received in evidence

1   as of this date.)

2   BY MS. DAYANANDA:

3   Q    Now, based upon your reading of MS-5, did you have any

4   more involvement in the copying of these files or turning

5   them over to the defense?

6   A    No, I did not.

7   Q    And could you, in your capacity, Mr. Shatzkamer,

8   independently release files to defense counsel or to the

9   U.S. Attorney's Office?

10  A    Well, I could release files to the U.S. Attorney's

11  Office, but not to defense counsel.

12  Q    What are the steps you have to go through before you

13  release files to defense counsel?

14  A    Well, it wouldn't be me releasing them, it wouldn't be

15  my agency releasing them.  We have to go through our

16  big brother-big sister agency, ICE.

17  Q    And the big brother and the big sister agency, ICE, and

18  who else?

19  A    And the U.S. Attorney's Office.

20       MS. DAYANANDA:  I have nothing further.

21       MS. WHALEN:  Just briefly, Your Honor.

22  REDIRECT EXAMINATION

23  BY MS. WHALEN:

24  Q    Mr. Shatzkamer, your testimony is that your discussion

25  on October 15th with Ms. Mills is when Ms. Mills told you not

1   to release copies of the files to defense counsel; is that

2   correct?

3   A     That's correct.

4   Q     And it's your position that she never told you to review

5   that decision with your counsel at CIS; is that correct?

6   A     I can't recall.

7   Q     But you can recall that she told you on October 15th not

8   to provide copies of the files for defense counsel?

9   A     Yes, because I had gone over it with her.  I had said to

10  her, let me make sure I completely understand and we went

11  through it at least two or three times.  We even joked about

12  violating the Privacy Act could land someone in jail and pay

13  a hefty fine and I even stated that I don't have much longer

14  to go as an officer and that's not the way I want to go out.

15  Q     So, this conversation is crystal clear in your mind?

16  A     Well it's as clear as I can remember.

17  Q     Okay.

18                But with respect to her telling you not to

19  turn the files over to defense counsel?

20  A     I just can't recall.

21  Q     She told you not to turn copies of the files over to

22  defense counsel, isn't that correct?

23  A     She said that if we did, we would be in violation of the

24  Privacy Act and the Rules of Confidentiality.

25  Q     What you can't recall is whether she then told you to

1  speak to your counsel?

2  A    That's correct.

3            Counselor, I just want to say that at a later

4  point in time, I can't recall when, but I remember the ICE

5  agent telling me that Ms. Mills had suggested that I speak to

6  my counsel.  But I can't recall hearing that from Ms. Mills.

7  Q    Okay.  But the next you hear is on November 2nd where

8  Ms. Mills says it's okay to provide copies?

9  A    That's correct.

10 Q    But on November 2nd, you still don't provide copies?

11 A    That's correct.

12 Q    Now --

13 A    Actually, it was November 3rd.  I'm sorry.

14 Q    You were out that day, okay.

15            The final authority, you testified, I think a

16 moment ago, that you would have the authority to provide

17 copies to the U.S. Attorney of the files.  Isn't that

18 correct?

19 A    I could.

20 Q    Okay.

21            So despite your conversation on October 15th

22 with Ms. Mills, you still could have copied the files and you

23 still could have provided them to the U.S. Attorney's Office.

24 Isn't that correct?

25 A    Minus what I couldn't include.  But we had copies of

Colloquy                              68

1          So, that while the copying was completed on

2   Thursday, there was still certifying to be done.  Once the

3   certifying was complete and actually then called off, then

4   the files could have were turned over to counsel.

5          But, it's our position that DHS did comply

6   with the order immediately as soon as practically possible

7   considering the order came, I believe, at 3:30 in the

8   afternoon, a Tuesday, Wednesday was the federal holiday, and

9   they were turned over on Friday.

10         THE COURT:  But there was a telephone call to

11  Homeland Security for the files and they told defense

12  counsel, come get them.

13         MS. DAYANANDA:  That's correct, a phone call was

14  made by Ms. Whalen on the morning of Friday the 13th.  At

15  that point, I believe she spoke with Mr. Raphael who

16  indicated he was just about to call her regarding the

17  "A" Files and then we, the U.S. Attorney's Office, and

18  Agent Silverman then provide you had the files to counsel.

19         MS. WHALEN:  Your Honor, I'll let Ms. Alomar talk

20  more about Mr. Gupta.

21         But with respect to Mr. Gupta, just briefly.

22  He is unavailable now because the Government never served him

23  with a trial subpoena.

24         Had -- I mean, all of these issues aside it's

25  not the defense's job to preserve government evidence.  The

Colloquy                                    69

1   Government wants to call this witness, he is a witness that

2   is helpful to the Government.  The Government -- the trial

3   date at least November 9th was set on June 22nd.  I think it

4   was adjourned a week some time after then I.  But as of June

5   22nd, the Government knew there was a November trial date.

6   They never served Mr. Gupta with a subpoena.  They never

7   brought him in on a material witness.

8            THE COURT:  Were they obligated to serve him with a

9   subpoena?

10           MS. WHALEN:  If they wanted to call as a witness,

11  Your Honor, yes, I think they are obliged to serve him with a

12  subpoena at a minimum and not just simply say he tells he's

13  going to be unavailable.

14               My understanding is that the first step is,

15  when somebody says they're not coming in voluntarily, you

16  give them compulsory process.  Then --

17           THE COURT:  I understand that he said that he was

18  going to come in.

19           MS. WHALEN:  My understanding was he said he wasn't

20  going to come in, he was leaving.  We then had the deposition

21  on August 11th, again, he was not served with a subpoena.

22  I'm saying, at a minimum, once the Government knew he was

23  reluctant, they had a duty to at least serve him with a

24  subpoena.

25               I agree that a material witness order is a

Colloquy                                              70

1  serious step, but the Government could have gotten a material

2  witness order and then just consented to his release on a

3  significant bond; and this is important turns out this viewed

4  owned two pieces property in New York; he had two Co-op

5  apartments.  We didn't learn that until at the time of the

6  deposition, but that was meaningful property that could have

7  secured his stay in the United States for another two months.

8              This wasn't a hardship case, he was working,

9  he had a place to stay.  He had turned over very minimal bond

10 for immigration, and the Government didn't even -- the

11 Government could have come to court on a material witness

12 order, consented to his release if he simply turned over his

13 passport.

14             So, what I'm saying is that the ordinary

15 things that the defense would be required to do to secure a

16 witness's attendance at court were not complied with.  And to

17 now claim these unavailable because he's in India I think is

18 unavailing.

19             I agree, after the testimony, that given the

20 way the DHS system works, I don't know if Ms. Alomar will

21 agree with me, but it looks to me like the agent didn't have

22 many options at that point.  But, the fact is that they had

23 plenty of options before that point and none of them were

24 taken to even minimally, minimally to the point of just

25 giving the guy a subpoena, were taken to try to secure his

1    presence here.

2                    And given that he had substantial assets --

3              THE COURT:  I remember asking one of the witnesses

4    when he was about to board the plane if they had gotten to

5    him while he was on the plane what were the options of the

6    agents and they said they had none.

7              MS. WHALEN:  And I accepted that as true.  Maybe

8    Agent Silverman doesn't have arrest authority.  But had they

9    served him with a subpoena, they could now be moving for

10   contempt proceedings and his assets could be at issue and you

11   might be able to compel him to come back for those reasons.

12   But because no subpoena was given, there's basically nothing

13   anyone can do.  And, again, I disagree with the Government

14   the defense is not required to preserve the Government's

15   evidence.

16             THE COURT:  Okay.

17             MS. WHALEN:  With respect to the files.

18                    Your Honor, I think the problem here is that

19   the there were two court orders.  The Government agreed to

20   turn these files over to the defense counsel June 22nd.  You

21   incorporated that agreement as part of your discovery order.

22                    We heard from the witnesses, everybody was

23   pushing things off on everyone else.  But as of October 15th,

24   the Government demanded those files from Mr. Shatzkamer, the

25   copies.  Mr. Shatzkamer and Ms. Mills have a very different

Colloquy                                                   74

1    February 2009, the fact that we were able to take notes about

2    these files in February 2009, does not help us in terms of

3    cross-examination, preparation for a trial that's going to

4    start on November 16th.

5              THE COURT:  But, for the record, you now have those

6    files?

7              MS. WHALEN:  For the record, we now have those

8    files and the court has granted an adjournment for us to

9    review those files.

10             MS. ALOMAR:  Actually, Your Honor I'm still missing

11   three files.  I notified the Government last week that after

12   reviewing the files, that I was missing six.  The Government

13   came last Thursday and provided me with three and they

14   advised that they would still be forwarding the three more; I

15   still have not received them.

16             MR. GOLDSMITH:  Your Honor, if I can?

17             We mentioned that issue to the Court on

18   Thursday.  Ms. Alomar did give us a list of six files, three

19   of them we had, the Government had, and we gave copies that

20   day to both defense counsel.  The other three the Government

21   did not have.

22             The case agent located two of the remaining

23   files, made copies of them.  I believe those have been

24   FedExed and I believe are to be delivered today to both

25   defense counsel.  The final file, the sixth file, that

Colloquy                                    75

1   Ms. Alomar asked for concerns an individual who was arrested

2   relatively recently in some other part of the country.

3           As the ordinary policy with these "A" Files

4   goes, when that person was arrested, the "A" File was shipped

5   to him.  That order, that "A" File has been requested back

6   here.  As soon as it gets back here, we will make copies and

7   provide it to defense counsel.

8           Certainly, the agents as Agent Silverman

9   testified, worked quite heard Veterans Day and the following

10  day to make the copies.  They missed that one, or I should

11  say they missed these six, fully accidentally, plainly.  As

12  soon as we were notified about it, about it we did what we

13  could to get them to them.

14          THE COURT:  Okay.

15          MS. ALOMAR:  Your Honor -- are you finished?

16          MS. WHALEN:  Yes.

17          MS. ALOMAR:  With regards to Mr. Gupta, I would

18  like to add that the Government had many options available to

19  them to secure Mr. Gupta's attendance.

20          The first one which was the securing of his

21  passport.  Agent Silverman testified that the U.S. Attorney's

22  Office was, in fact, in touch with the trial attorneys with

23  immigration.  And they could have made a request to the

24  court, the immigration court, at that time that as a

25  condition of his bond, that Mr. Gupta turn over his passport

1    something that the Government never did.

2              The Government had many options thereafter

3    because, after the June 22nd court date where the court

4    allowed the deposition of Mr. Gupta, the Government was aware

5    that it was not necessarily permitting the introduction of

6    that deposition.  So, they had all of the opportunities at

7    that time to --

8              THE COURT:  Let me ask you this.  Mr. Gupta, at

9    that time, the only charge against him was an illegal alien;

10   is that correct?

11             MS. ALOMAR:  There was the illegal alien and then

12   thereafter Your Honor there were -- the Government agreed not

13   to prosecute him for his criminal acts here in the

14   United States.

15             THE COURT:  So, the only thing pending was his

16   removal from the country.

17             MS. ALOMAR:  That is correct.  And he was hoping to

18   secure voluntary departure because he had a pending I-140

19   application which is a labor certificate.  So, that labor

20   certificate if he received voluntary departure he could

21   receive the benefit of that labor certification and reenter

22   and seek a waiver to reenter the country.

23             And it's our position that, at that time, that

24   the Government had every single opportunity to secure his

25   passport or to put a higher bond, do a subpoena, things that

Colloquy                                              77

1  they never did.

2             In addition, Your Honor, the Government has

3  provided us with no evidence whatsoever as to what they have

4  done in order to secure his appearance back into the

5  United States.

6             THE COURT:  The me ask the Government.

7             Is there a possibility of getting him back?

8             MR. GOLDSMITH:  Your Honor, we don't know where he

9  is.  The afternoon of the 13th, he told the agent that he

10 would meet him the following morning and then he got on a

11 plane and left.

12            THE COURT:  Okay.

13            MS. ALOMAR:  Your Honor, it's or position that the

14 defense has not been permitted to properly cross-examine this

15 witness because -- and that his appearance at trial.

16            THE COURT:  But at the deposition you

17 cross-examined him.

18            MS. ALOMAR:  We did, Your Honor.

19            But here, during the hearings today, one of

20 the witnesses provided us with a screen printout of

21 Mr. Gupta's immigration file, something that the defense

22 didn't have until last week.  And during that court date, it

23 showed that Mr. Gupta had sent in an application from a

24 particular attorney, information that we didn't have at the

25 deposition.

Colloquy                                    78

1        THE COURT:  But this hearing was not a discovery

2   proceeding, this hearing was for a specific purpose.

3        MS. ALOMAR:  Yes, Your Honor.

4            But had we had that, had we had that

5   information at the time of Mr. Gupta's deposition, we would

6   have been able to cross-examine him on those issues and we

7   were deprived of that opportunity because we did not receive

8   that documentation.

9            And now for Mr. Gupta's deposition to be

10  permitted, then we're deprived of that opportunity to

11  cross-examine him because he's not here.  And now that we

12  have the material, there's no witness to ask the questions

13  to.

14           It was the Government's obligation to, at the

15  very minimum, subpoena Mr. Gupta.  The Government said, you

16  know, in reality set the mechanisms they did very little to,

17  you know, ensure that Mr. Gupta came to court.  Actually, in

18  my opinion, they did nothing.  They had the opportunity as of

19  June to subpoena him and they did not.

20       THE COURT:  So, you say an act of omission made him

21  unavailable?

22       MS. ALOMAR:  Yes, Your Honor.

23       THE COURT:  You have cases on that?

24       MS. ALOMAR:  *United States v. Mann.  United States*

25  *v. Olivares* which is a case here, it was in the Southern

Colloquy                          79

1  District and was decided, I believe, in 2007 where the court

2  specifically denied the Government's introduction of the

3  testimony of a witness because the Court felt that the

4  Government set the mechanism in place to prevent this

5  witness --

6        THE COURT:  But I'm saying omission.

7        MS. ALOMAR:  Right.  In that --

8        THE COURT:  You're saying that the Government in

9  this case set the mechanism for Mr. Gupta's departure?

10       MS. ALOMAR:  Yes, Your Honor.  They could have

11  served him with a subpoena.  They could have requested that

12  he surrender his passport.  They could have increased his

13  bond.  They could have done a number of things that they did

14  not do.

15       THE COURT:  That's a little different than that

16  Southern District case where they said in the Southern

17  District that there was acts of commission.

18       MS. ALOMAR:  Well in, that case, it involved

19  essentially the individual could have been detained because

20  of his plea of guilty on a sentencing case.

21            But in that case, too, the Court also found

22  that the Government had certain means to secure this

23  witness's attendance and that the Government didn't use those

24  means.  And, as a result, they denied the Government's

25  request to introduce their witness's deposition at trial.

Colloquy                                           80

1          MR. GOLDSMITH:  Your Honor, if I could respond on

2    the Gupta issues and Ms. Dayananda will respond on "A" File

3    issues.

4               First, the cases that Ms. Alomar mentioned,

5    both of those involve acts of comission by the Government.

6    In the *Mann* case in the First Circuit, the Government

7    actually gave the witness a plane ticket to use to leave the

8    country.  That is far from what happened here.

9               In the Olivares case, in the Southern

10   District, the Government consented to that witness's release

11   on bail in violation of a statute that specifically required

12   that he be detained.  Again, there is nothing like that in

13   this case.

14              The Government did preserve its evidence in

15   this case by moving for and taking the deposition of

16   Mr. Gupta.  He said all along that he wanted to leave but

17   that he would return for trial.  On that basis, I'm not

18   actually sure that we could have gotten, we or the defense,

19   could have gotten a material witness warrant from the Court

20   because the witness said that he would be here.

21              The defense raises the issues of giving him a

22   trial subpoena which, frankly, we think would have done

23   little, if anything, to change what took place.  They

24   mentioned taking his passport.  He's an Indian citizen, Your

25   Honor, even if we had taken his passport, he still could have