UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X

UNITED STATES OF AMERICA,

                                                                                                                                          08 CR 288 (SJ)

            v.

                                                                                                                              <u>MEMORANDUM</u>
                                                                                                                              <u>AND ORDER</u>

THOMAS ARCHER
              Defendant.

----------------------------------------------------X

A P P E A R A N C E S

UNITED STATES ATTORNEY
Benton J. Campbell
United States Attorney
271 Cadman Plaza East
Brooklyn, NY 11201
By:    Andrew Goldsmith
        Soumya Dayananda

ALOMAR & ASSOCIATES, P.C.
60-89 Myrtle Avenue
Ridgewood, NY 11385
By:    Karina Alomar
Attorney for Thomas Archer

JOHNSON, Senior District Judge:

       Defendant Thomas Archer ("Archer"), an attorney, was charged in a four

count superseding indictment with conspiracy to commit visa fraud (Count One)

and with three counts of visa fraud (Counts Two, Four and Five).[1] On March 15, 2010, the case proceeded to trial and on March 24, 2010, he was convicted of all counts charged. (His co-defendant Rukhsana Rafique ("Rafique") was convicted of three of the four counts. She does not join in this motion.) Archer now moves the Court for a Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(c) ("Rule 29"), or, alternatively, a new trial, pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33"). The following is a brief summary of the evidence adduced at trial.

The Department of Homeland Security ("DHS") CSS/Newman ("LULAC" or the "Program") program permitted certain undocumented residents of the United States to gain legal status. To be eligible, an applicant had to meet certain requirements. Specifically, the applicant had to have been present in the United States illegally as of January 1, 1982, and both applied for and rejected from a previous program on account of having left the United States in the interim. Two ancillary benefits accompanied the filing of a LULAC application: the applicant could legally work in the United States, and could travel in and out of the United States while the application was pending.

Archer operated a law practice in Jackson Heights, New York (which he later moved to Jamaica, New York). Rafique worked as his assistant at his office. On behalf of clients, he filed between 230 and 240 applications (the "Applications"

---

[1] The Court granted the government's motion to dismiss Count Three prior to trial.

2

or "I-687s") for the LULAC program, none of which were granted. One hundred sixty-eight Applications indicated that the applicant entered the United States within just a year of the January 1, 1982 cut-off date. Many Applications were accompanied by a template affidavit filled out in part by the applicant and in part by an affiant who claimed to have knowledge of the applicant's dates of entry and departure from the United States. Information in the fill-in-the-blank affidavit that tended to be filled out in advance included the applicant's date of arrival in the United States and any periods of travel— dates critical to an applicant's eligibility under the Program. (See, e.g.,Gov't Opp. to Def. Mot. Ex. C at 18.)

*Gulistan*

Gulistan NLN[2] ("Gulistan"), one of Archer's clients, testified that he paid $1,500 to Archer to file an I-687 on his behalf. Gulistan, a native of Pakistan, is illiterate with limited English verbal skills. Gulistan was instructed by Archer's co-defendant Rafique to sign the I-687, though it was not translated for him. The Application contained false information, all of which, if true, would have fulfilled criteria of LULAC. For example, while Gulistan testified that he came to the United States once in 1981 for a short stay and returned in 2000 with a visa, his I-687 states that he last arrived in August 1999 without a visa. The former entry date and type fails to meets LULAC's requirements. The latter fulfills LULAC. Also,

---

[2] The parties were not aware of any last name for Gulistan, nor did Gulistan claim to have a last name. Thus "NLN" refers to "no last name."

Gulistan fathered seven children in Pakistan ranging between 10 and 25 years old, in other words, as late as 2000. To give the impression that he was instead living in the United States at that time and periodically going to Pakistan to have children, his I-687 lists seven short visits between 1988 and 1999 that Gulistan denied having taken. Indeed, Gulistan testified that he was living in Pakistan almost continually during that time, and made only few trips to Russia.

Archer signed Gulistan's Application and filed a notice of appearance on behalf of Gulistan to DHS. Gulistan worked and traveled to Pakistan while his application was pending.

When contacted by DHS for an interview in furtherance of his Application, Gulistan took DHS' letter to Archer, who wrote to DHS and requested an adjournment based on a scheduling conflict. Despite his limited English skills, Gulistan attended the rescheduled interview without Archer. Gulistan testified that he "showed the documents regarding my children [in Pakistan]" and that he was questioned about them.

Guliastan was subsequently questioned by Eric Silverman of Immigration and Customs Enforcement ("ICE"), the enforcement branch of DHS, about some of the false statements on his I-687. He told Agent Silverman that the information in his I-687 was wrong and agreed to meet with Archer while wearing a wire. During the tape-recorded meeting between Gulistan, Archer and Rafique, Archer

admonished him for attending the meeting at DHS and advised him to move from his current residence to avoid discovery by the government:

> Archer: What did the immigration officer tell you when you at the interview?
>
> Archer: Did we give him any advice about the interview. . .did we tell him not to go . . .did we try to get him to withdraw it?
>
> Rafique: Yeah. . . actually he wanted to go . . . everyone we were telling not to go. . .
>
> Archer: At that point. . . yeah, because they were messing with them. What does he want us to do now?
>
> [ . . .]
>
> Rafique: This actually somebody scared him.
>
> Archer: Scared him what?
>
> Rafique: That he will be in a problem later on.
>
> Archer: What? That's why we told him not to go. . .
>
> [. . .]
>
> Archer: Tell him the law will change. . .
>
> [. . .]
>
> Archer: Tell him, if he is moved he will probably (unintelligible)
>
> Rafique: Mr. Archer is saying that you should move from the place where you are staying now.
>
> Gulistan: Ok.
>
> Rafique: Change your residence.
>
> Archer: If we can help you in the future we will. . .

5

| | | |
|---|---|---|
| Rafique: | | He is saying that when the new law comes then we will help you with that. . . |
| Archer: | | Ok? |
| Rafique: | | …and you should have peace of mind.  That is why I introduced you to Mr. Archer. |

(Ex. H to Gov't Mem. at 6-11.)


*Nizar Ahmad*

Nizar Ahmad ("Ahmad") also testified at trial.  He claimed to have paid Archer $2,000 after telling Rafique that he wanted to acquire legal status in the United States.  Like Gulistan, Ahmad knew nothing of the LULAC program and did not write or read English.  Also like Gulistan, Ahmad's Application gave false dates for his entry to and travel from the United States, dates which if true would have met the LULAC requirements.  Ahmad's dates of employment were also doctored to correspond with the false travel dates.  Archer signed Ahmad's Application and filed a notice of appearance on Ahmad's behalf.  He then adjourned Ahmad's interview based on a scheduling conflict and, prior to the second interview date, sent a notice to DHS bearing Ahmad's signature which, unbeknownst to Ahmad, stated "I wish to withdraw my CSS application (I-687)."

*Iris Ally*

Iris Ally ("Ally") also retained Archer's services. Although she was a citizen of Guyana, an English-speaking country, she did not read English well and did not read or understand her I-687 application. She did not know the requirements or existence of the LULAC program prior to going to Archer's office, but her I-687 application contained similar travel dates to Ahmad's Application, which were false. Ally's Application was also accompanied by a fill-in-the-blank affidavit identical to Ahmad's which contained false information. When called for her DHS interview, Ally went to Archer's office where "the receptionist" told Ally not to attend the interview and to obtain a doctor's note. When Ally produced such a letter, Archer submitted a request to adjourn based on her illness. Ally never attended her interview and was denied status in a January 29, 2007 decision. She had paid Archer $2,500 for his services.

*Mohammad Ally*

Mohammad Ally, Iris Ally's ex-husband ("Mohammad"), suffered a similar fate. He went to Archer's office with the hopes of legalizing his status. He also paid $2,500 for Archer's services in connection with an I-687 application, unaware of LULAC or its requirements. Mohammad was directed by Rafique, Archer's assistant, to find individuals willing to sign the same fill-in-the-blank affidavits used by other client-witnesses. Mohammad's affidavit stated that the affiant knew

him since 1981, which Mohammad testified was false. After Rafique told him to "get someone to do it," Mohammad found two people willing to sign the affidavits. Archer signed Mohammad's application, which gave false dates of travel and employment, and were accompanied by the affidavits. Upon notice that Mohammad was to appear at DHS for an interview, Archer discouraged Mohammad's attendance, telling him that the application had to be withdrawn. Mohammad became upset and asked for his money back, which Archer refused, telling him the money was "used up for the case." Mohammad conceded to Archer's withdrawal of his Application

## DISCUSSION

*Rule 29(c) Motion*

A defendant challenging the sufficiency of the evidence adduced at trial bears a heavy burden. United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002). Accordingly,

> [w]hen a defendant moves for a judgment of acquittal, the Court must determine whether upon the evidence, given full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If it concludes that upon the evidence there must be such a doubt in a reasonable mind, it must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If it concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, it must let the jury decide the matter.

United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) (collecting cases). Furthermore, it is "axiomatic," on a motion for acquittal, that all inferences be resolved in favor of the government, and, with respect to each element, the evidence be viewed in the light most favorable to the government. United States v. Skinner, 425 F.2d 552, 554 (2d Cir. 1970). Finally, the Court is duty bound to "resolve all issues of credibility in favor of the jury's verdict." United States v. Hasan, 586 F.3d 161, 166 (2d Cir. 2009) (quoting United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002)). It is with this standard in mind that the Court addresses Archer's claim that Rule 29(c) relief is warranted.

Archer's claim that there was insufficient evidence to prove his membership in the conspiracy is unavailing. He filed notices of appearance with DHS on behalf of all four clients who testified. Two of the witnesses (Iris and Mohamad Ally) testified that he provided them with template affidavits containing false dates of entry to and exit from the United States-- dates that would qualify them for the LULAC program. All four witnesses testified that they knew nothing of the LULAC program or its requirements when they retained Archer's services, rendering implausible the argument that they themselves fabricated their dates of employment and entry, particularly in light of their limited literacy in English. Archer signed and submitted the I-687 applications on each client's behalf, caused adjournments of DHS interviews, and submitted documentation stating that Ahmad wished to withdraw his application when Ahmad testified otherwise.

Moreover, the June 7, 2007 tape-recorded conversation revealed that, with co-defendant Rafique, Archer discouraged Gulistan from attending his DHS interview. Specifically, when Gulistan asked Archer and Rafique for a "satisfaction" that he would not later have a "problem" with his application, Archer replied "That's why we told him not to go. . . Right?" Archer then suggests that Gulistan "move from his current place of residence," to avoid the authorities. This evidence is sufficient to support the jury's finding that Archer was not merely negligent in failing to attempt to verify the truthfulness of the statements in the Application, but engaged in a conspiracy to commit visa fraud, as charged in Count One of the superseding indictment. See In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 113 (2d Cir. 2008) ("A defendant's knowing and willing participation in a conspiracy may be inferred from . . . [his] presence at critical stages of the conspiracy that could not be explained by happenstance, or lack of surprise when discussing the conspiracy with others.") It is also sufficient evidence from which the jury could conclude that Archer did commit visa fraud with respect to Gulistan's Application, as charged in Count Two.

Likewise, the clients associated with Counts Four and Five, Nizar Ahmad and Iris Ally, testified that they had no knowledge of the LULAC program when they retained Archer, no knowledge of its requirement that they have entered or exited the United States during any particular time period, and were not explained these requirements. Archer personally submitted Applications on behalf of both

Iris Ally and Nizar Ahmad, including filing notices of appearance.  Archer personally requested adjournments of both Ahmad's and Iris Ally's interview and in Ahmad's case, submitted an application withdrawal without his client's permission.  The evidence also demonstrated that Archer's office generated fill-in-the-blank affidavits that prompted the affiants to choose between a limited number of answers, any of which, if they had been true, would support a LULAC application.

Moreover, the record contained evidence of at least 230 other LULAC Applications (the "Other Applications") filed by Archer, none of which were granted, and many of which bore significant similarities to the Applications at issue.  For example, 45 of those applications were supported by the same suggestive fill-in-the-blank affidavits used in support of Iris Ally's and Ahmad's Applications, and many of the Other Applications gave similar dates of entry and exit.  From all of this evidence, the jury could reasonably conclude that Archer knowingly intended to defraud the United States in his preparation of the Iris Ally and Nazir Ahmed Applications.

Viewing this evidence in the light most favorable to the government, the Court concludes that a rational jury could have found Archer guilty of the conspiracy to commit as well as the commission of visa fraud in connection with Gulistan, Ahmad, and Iris Ally.  See, e.g., United States v. Cote, 544 F.3d 88 (2d Cir. 2008) (the court must decide whether "any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt"). Therefore, Archer's Rule 29 motion must be denied.

*Rule 33 Motion*

Archer's Rule 33 motion fairs no better. Rule 33 permits a district court to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, 'it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of the credibility assessment.'" <u>United States v. Ferguson</u>, 246 F.3d 129, 133-4 (2d Cir. 2001). In this case, Archer argues that "the jury was wholly unable to differentiate between acts of lawful legal work" and acts of fraud and that "Archer was found guilty . . . for no other reason than because he signed statements." (Def. Mem. at 24.) This argument assumes that the client-witnesses Gulistan, Ahmad and the Allys, were patently incredible, an argument already rejected in the Court's discussion of the Rule 29 motion. The evidence presented established that Archer filed notices of appearance with DHS on behalf of four client-witnesses, delayed interviews with DHS by adjourning them or discouraging the witnesses from attending, advised Gulistan to change his place of residence after Gulistan's false statements were revealed by DHS and withdrew both Mohamad Ally's and Ahmad's application, the latter of which he withdrew without

the client's consent. The evidence also showed an overwhelming number of other LULAC applications filed by Archer's office with similar defects from which the jury could properly infer that the false statements given on the client-witnesses I-687s were neither made in error nor a highly coincidental fabrication among his client base.

In exercising its discretion under Rule 33, "the court is entitled to weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." <u>United States v. Robinson</u>, 430 F.3d 537, 543 (2d Cir. 2005) (citations omitted). Here, testimony of the witnesses, combined with the documentary evidence, lead the Court to conclude that there is no "real concern that an innocent person may have been convicted." <u>Ferguson</u>, 246 F.3d at 133. Archer's Rule 33 motion is denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Rule 29 and Rule 33 motions are DENIED.

DATED: July 19, 2010 _____/s_____
       Brooklyn, NY                          Sterling Johnson, Jr.