109

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,      : 08-CR-00288(SJ)
4                                 :
                                  :
5                                 :
        -against-                 : United States Courthouse
6                                 : Brooklyn, New York
                                  :
7                                 :
                                  : Tuesday, March 16, 2010
8   THOMAS ARCHER                 : 12:00 p.m.
    and RUKHSANA RAFIQUE,         :
9                                 :
           Defendant.             :
10
   - - - - - - - - - - - - - X
11

12
           TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
13        BEFORE THE HONORABLE STERLING JOHNSON, JR.
            UNITED STATES SENIOR DISTRICT JUDGE
14
                   A P P E A R A N C E S:
15
   For the Government: BENTON J. CAMPBELL, ESQ.
16                      United States Attorney
                        Eastern District of New York
17                      271 Cadman Plaza East
                        Brooklyn, New York 11201
18                  BY:  ANDREW EDWARD GOLDSMITH, ESQ.
                        JASON ALLEN JONES, ESQ.
19                      SOUMYA DAYANANDA, ESQ.
                        Assistant United States Attorney
20

21
   For the Defendant:   ALOMAR & ASSOCIATES, P.C.
22                       60-89 Myrtle Avenue
                         2nd floor
23                       Ridgewood, New York 11385
                    BY: KARINA E. ALOMAR, ESQ.
24                       GIACONDA RODRIGUEZ

25

110

1
2
3          A P P E A R A N C E S:  (Continued)
4
5
6    For the Defendant:     FEDERAL DEFENDER OF NEW YORK
                                16 Court Street
                                3rd Floor
7                               Brooklyn, New York  11201
                           BY:MILDRED M. WHALEN, ESQ.
8                               THALLEN BRASSEL, ESQ.
9
10
11
12               A L S O    P R E S E N T:
13
14          Ravi Kotru          Hindi Interpreter
15
            Hafeez Amad         Urdu Interpreter
16
17          Alyas Bhatti        Urdu Interpreter
18
                  Special Agent Rajiv Bhatia
19
20
21
22   Court Reporter:  Victoria A. Torres Butler, CRR
                       Official Court Reporter
23                     Telephone: (718) 613-2607
                       Facsimile: (718) 613-2324
24                     E-mail:    VButlerRPR@aol.com
25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.

Proceedings                                    111

1              (In open court.)

2              THE CLERK:  All rise.

3              (Judge Johnson takes the bench.)

4              THE COURT:  Bring the jury in.

5              MS. WHALEN:  Your Honor, I realized I forgot to ask

6      a few questions yesterday.  So if I could, please, just ...

7              THE COURT:  What do you call a few?

8              MS. WHALEN:  Two for me and then three for Ms.

9      Alomar.  Five.

10             THE COURT:  Okay.

11             MS. WHALEN:  Thank you.

12             THE COURT:  Are your witnesses going to be short or

13     long today?

14             MR. GOLDSMITH:  Half an hour each on direct.

15             THE COURT:  Okay.

16             (Pause in the proceedings.)

17

18             (Continued on the following page.)

19

20

21

22

23

24

25

1              (Jury enters the courtroom.)

2              (The following occurred in the presence of the

3     jury.)

4              THE COURT:  Where is the witness?

5              MR. GOLDSMITH:  I'll get him.

6              (Mel Shatzkamer enters the courtroom and takes the

7     witness stand.)

8              THE COURT:  You're still under oath.

9

10    MEL SHATZKAMER,

11         called as a witness, having been previously duly

12         sworn, was examined and testified as follows:

13

14             THE COURT:  You won't be long, right?

15             MS. WHALEN:  I will not be long, I promise.

16             THE COURT:  I promise too.

17    CROSS-EXAMINATION (continued)

18    BY MS. WHALEN:

19    Q    Mr. Shatzkamer, yesterday I asked you questions about

20    Freedom of Information Act requests.

21             Do you remember those questions?

22    A    Not really.  I'm sorry, counselor.

23    Q    Okay.  Well, just in general, how long is the response

24    time on Freedom of Information Act requests from your agency?

25    A    I don't know.

1    Q    Any idea?  Any estimate?

2    A    No, I'm sorry.

3    Q    If an attorney made a Freedom of Information Act request

4    for a client, would the entire immigration file be turned

5    over, or would the attorney have to specifically ask for each

6    prior application that he wanted to see?

7    A    I'm really -- I'm sorry.  I'm really not certain about

8    this either.

9    Q    Officer Shatzkamer, the Immigration Service charged a fee

10   for the filing of these I-687 applications; is that correct?

11   A    That's correct.

12   Q    Do you recall what the fee was?

13   A    Oh, gosh.  I'm sorry, I don't.

14   Q    Does $255 for the application sound accurate?

15   A    I'm sorry, I can't answer.  I really can't recall.

16         MS. WHALEN:  Thank you.  No further questions.

17         THE COURT:  Is that it?

18         MS. ALOMAR:  Your Honor, if I could be permitted to

19   ask two questions with regards to ...

20         THE COURT:  Go ahead.

21         MS. ALOMAR:  Thank you, your Honor.

22   FURTHER CROSS-EXAMINATION

23   BY MS. ALOMAR:

24   Q    Officer Shatzkamer, if I showed you the directions to the

25   I-687 applications, would that refresh your memory with

1    regards to the application fees that were being collected for

2    these forms?

3    A      Probably.

4              MS. ALOMAR:  Your Honor, may I please approach the

5    witness?

6              THE COURT:  Go ahead.

7              MS. ALOMAR:  (Handing.)

8              THE COURT:  You're showing him Government's Exhibit

9    what?

10             MS. ALOMAR:  It's part of the -- it's the directions

11   for filling out the I-687.

12             THE COURT:  What is the exhibit number?

13             MS. ALOMAR:  Just one moment, your Honor.

14             (Pause in the proceedings.)

15             MS. ALOMAR:  1C -- 1A.

16             THE COURT:  Defendant's or Government's?

17             MS. ALOMAR:  Government's.

18             THE COURT:  Government's 1A, does that refresh your

19   recollection?

20             THE WITNESS:  Unless it's -- unless the fee is

21   listed on here.

22             MS. ALOMAR:  Could you please look at it.

23             THE WITNESS:  Okay.

24             MS. ALOMAR:  Thank you.

25             THE WITNESS:  You're welcome.

1              (Perusing document.)

2              THE COURT:  Show him what you want him to see.

3              MS. ALOMAR:  (Indicating.)

4              THE COURT:  Does that refresh your recollection?

5              THE WITNESS:  Yes, it does, your Honor.

6              THE COURT:  Okay.  Next question.

7    BY MS. ALOMAR:

8    Q    Can you tell us what the fee that was being collected for

9    the I-687 forms?

10   A    Yes.  At this point in time, the fee was $255, and an

11   additional $70 for the capture of the biometrics.

12   Q    So your agency then collected this fee for 79,000

13   applications?

14   A    That would -- that would appear to be correct.

15   Q    So is it fair to say then that your agency collected over

16   25 million dollars on these applications?

17   A    It would appear that way.

18            MS. ALOMAR:  Thank you.  No further questions.

19   REDIRECT EXAMINATION

20   BY MR. GOLDSMITH:

21   Q    Officer Shatzkamer, aside from when you called me this

22   morning looking for an umbrella you misplaced, have you and I

23   spoken since you got off the witness stand yesterday?

24   A    No.

25   Q    You were asked on cross-examination yesterday about the

1   total number of CSS Newman (LULAC) Thomas Archer filed.

2          Do you recall how many applications he filed total?

3   A   I'm sorry?

4          THE COURT:  Can you keep your voice up?

5          MR. GOLDSMITH:  I think the mic is not on.

6          (Pause in the proceedings.)

7   BY MR. GOLDSMITH:

8   Q   You were asked yesterday on cross-examination about the

9   total number of CSS Newman (LULAC) applications Thomas Archer

10  filed.

11         Do you recall how many applications he filed in

12  total?

13  A   I can't recall the total, but it was somewhere in the

14  area of, I think it was, 256 or in the 250's, I believe.

15  Q   Do you recall whether any application that Thomas Archer

16  filed, however many there were, was granted?

17  A   That I do recall.

18         None were granted out of the total.

19  Q   You were asked on cross-examination about ten or so

20  applications prepared by Thomas Archer and filed by Thomas

21  Archer that are still pending.  Ms. Whalen asked you to

22  consider if those applications were granted, Archer's

23  application success rate might be better than the national

24  average.

25         Do you know specifically where those ten or so

1  applications are in the application process right now?

2  A    They're basically sitting in the files, and they have

3  notices of intent to deny issued.

4  Q    Could you remind the jury, please, why those are issued?

5  A    Notices of intent to deny are issued because the

6  applicant didn't submit sufficient evidence to show that they

7  qualified for the program.

8  Q    Do you know why your agency hasn't taken final action on

9  those applications?

10  A    Yes.

11  Q    Why is that?

12  A    Well, because all the files are being held in abeyance

13  pending this trial.

14  Q    You were asked on cross-examination quite extensively

15  about what else might be in the A files of the Archer clients.

16          Just so there's no confusion, could you tell us

17  again, please, what's in the boxes that are Government

18  Exhibit 2?

19  A    Basically the documents that the aliens have filed or

20  documents that have been filed on their behalf, for instance,

21  I-687's which we looked at; and there may be petitions filed

22  regarding marriage; there might be petitions regarding

23  employment; there might be applications for political asylum;

24  there might be applications from another previous IRCA

25  program, the special agricultural workers.  So, some of those

1    files may have those additional filings, plus supporting

2    documents, such as biographic information, copies of

3    passports, security checks on individuals.  In fact if there

4    are any criminal records, those would be included in those

5    same A files.  Virtually almost everything associated with an

6    alien that they'd file with my agency would be kept in a

7    chronological order in those A files.

8    Q    And those files, those complete files for the 175

9    applicants, are what's in Government Exhibit 2, correct?

10   A    That's correct.

11   Q    I want to back up for a minute to the question about

12   total number of applications that Thomas Archer filed.  You

13   said you weren't certain about the exact number.

14            MR. GOLDSMITH:  May I approach, your Honor?

15            THE COURT:  You may.

16            MR. GOLDSMITH:  (Handing.)

17            Officer Shatzkamer, I'm handing you what's been

18   marked just for identification as Government Exhibit 100,

19   which defense counsel has.

20            I don't want you to read it out loud.  If you could

21   just read to yourself, please, the highlighted portion, and

22   tell me when you're done.

23            THE WITNESS:  (Perusing document.)  I'm done.

24   BY MR. GOLDSMITH:

25   Q    Does that refresh your recollection more specifically

1    about how many in total 687 applications Thomas Archer filed?

2    A    Yes.

3    Q    And how many, more specifically, how many did he file?

4    A    Two hundred and thirty-four.

5    Q    Thank you.

6         Again, as you said before, none of those were

7    granted; is that correct?

8    A    That's correct.

9    Q    Now, going back to the A files.

10        You were asked on cross-examination yesterday about

11   whether the files of some of Thomas Archer's clients contained

12   applications, the A files that is, whether they also contained

13   applications for other immigration benefits prepared by other

14   lawyers in addition to Mr. Archer.  Miss Whalen referred to

15   that as attorney shopping.

16        Approximately what proportion of the 175 people

17   whose applications you reviewed had anything at all in their

18   files other than the 687's prepared by Thomas Archer and

19   related documents?

20   A    Approximately one-third.

21   Q    So then what proportion of the 175 had only materials

22   prepared by Thomas Archer and related documents?

23   A    Approximately two-thirds.

24   Q    So to use Ms. Whalen's terms, then two-thirds of those

25   applicants bought just one lawyer, Thomas Archer, right?

M. Shatzkamer - Redirect / Goldsmith          120

1   A     I'm sorry?

2   Q     To use Ms. Whalen's terms, two-thirds of those 175

3   applicants bought just one lawyer, Thomas Archer; is that

4   right?

5   A     That would be correct.

6   Q     You were asked yesterday on cross-examination about

7   attorneys who were convicted of fraud because they sold

8   affidavits to applications for immigration benefits.

9              MS. ALOMAR:  Objection.

10             MS. WHALEN:  Objection.

11             THE COURT:  What was the objection?

12             MS. WHALEN:  Judge, I think that's a

13  mischaracterization of the question.  I believe the question

14  was affiants who were convicted of fraud.

15             THE COURT:  Okay.

16             MR. GOLDSMITH:  Excuse me.

17  BY MR. GOLDSMITH:

18  Q     Could you remind the jury, please, where affidavits come

19  into the CSS Newman (LULAC) application process?

20  A     Affidavits came into the CSS Newman application process

21  as proof of the applicant being physically present in the

22  United States as of January the 1st of 1982 to qualify for the

23  program.

24             MR. GOLDSMITH:  May I approach, your Honor?

25             THE COURT:  You may.

1    MR. GOLDSMITH:  (Handing.)

2        I'm handing you Government's Exhibits in evidence 4B

3    and C, 5B and C, 10B and C, and 12B and C.  We put these into

4    evidence with you yesterday.

5    Q    Could you just tell the jury briefly what those are,

6    those documents?

7    A    These are affidavits submitted in support of various

8    applicants who hadn't submitted sufficient evidence at the

9    time of filing, and these were submitted with documentation

10   from a law firm in support of those applications in response

11   to those -- to notices of intent to deny so that these

12   applicants could appear to be eligible for the program.

13   Q    What are the names of the applicants for whom those were

14   submitted?

15   A    Gulistan.

16        THE COURT:  That's in evidence?

17        MR. GOLDSMITH:  These are in evidence, your Honor.

18   We're going to actually show them to the jury with later

19   witnesses today.

20        THE COURT:  All right.

21   A    Gulistan no last name, Iris Ally and Mohammad Ally and

22   Nizar Ahmad.

23   Q    Were any of these affidavits prepared by any of those

24   lawyers who were convicted for preparing fraudulent affidavits

25   and selling them to affiants?

M. Shatzkamer - Redirect / Goldsmith                122

1            MS. ALOMAR:  Objection.

2            MS. WHALEN:  Objection, your Honor.  That's a

3    mischaracterization of the question yesterday.

4            THE COURT:  Yeah.  And how would he know what the

5    lawyer prepared?

6            MR. GOLDSMITH:  Defense counsel asked him yesterday,

7    your Honor, about these lawyers who were convicted for --

8            MS. WHALEN:  Objection, your Honor.

9            Could we approach?

10           MR. GOLDSMITH:  Sure.

11           (Sidebar.)

12           (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                       123

 1          (Side-bar conference held on the record out of the
 2   hearing of the jury.)
 3          MS. WHALEN:  I wasn't asking about the lawyers.  I
 4   was asking about the affiants who had been convicted.
 5          MR. GOLDSMITH:  The affiants who had been convicted?
 6          MS. WHALEN:  The affiants, the people who filled out
 7   the affidavits.  They were convicted for fraud, not the
 8   lawyers.
 9          MR. GOLDSMITH:  I wasn't trying to mischaracterize
10   it.  I apologize if I'm mistaken.
11          I'll re-ask the question.
12          (Sidebar end.)
13          (Continued on following page.)
14
15
16
17
18
19
20
21
22
23
24
25
```

M. Shatzkamer - Redirect / Goldsmith          124

1          (In open court.)

2    BY MR. GOLDSMITH:

3    Q    Officer Shatzkamer, those affidavits you just looked at,

4    were any of them prepared by affiants, that is the people who

5    signed the affidavits, who were convicted of fraud for selling

6    affidavits?

7    A    No.

8    Q    Also concerning these affidavits yesterday, you were

9    asked about fill-in-the-blank affidavits.  You said a moment

10   ago that the affidavits were related to showing that the

11   individuals were in the United States at the appropriate time,

12   the applicants.

13          MR. GOLDSMITH:  Your Honor, the two affidavits that

14   defense counsel used yesterday, which were part of Government

15   Exhibit 2, I'd like to separately mark those as 2A and 2B.

16   Defense counsel have copies.

17          THE COURT:  All right.

18          (Government's Exhibits 2A and 2B were received in

19   evidence.)

20   BY MR. GOLDSMITH:

21   Q    Officer Shatzkamer, this is one of those affidavits that

22   you looked at yesterday.  Now it's marked 2A.

23          (The above-referred to exhibit was published.)

24   Q    Does your screen work today?

25   A    Yes, it does.

M. Shatzkamer - Redirect / Goldsmith                125

1   Q     Great.

2         Looking at the bottom of the form, can you tell

3   whether this form was created by the United States Government?

4   A     No, I can't.

5   Q     In the lower left corner, does it have a form number?

6   A     Oh, yes, it does.

7   Q     What does that indicate to you?

8   A     It indicates that this was a United States Department of

9   Justice INS form.

10  Q     And what form number was it?

11  A     It's form number I-488.

12  Q     Three lines below the form number, could you read that

13  short line for us, please?

14  A     Yes.  Revision October the 1st, 1972.

15  Q     Let me zoom in a little bit closer.

16        (Pause in the proceedings.)

17  Q     What is the year there?

18  A     It's October 1st, '72.

19        MS. WHALEN:  I think we'd stipulate that it's

20  actually '78.

21        THE WITNESS:  Oh, is it?  Sorry.

22        THE COURT:  Your eyes are bad.

23        MR. GOLDSMITH:  It's also a bad copy, your Honor.

24        Thank you, Officer Shatzkamer.

25        THE WITNESS:  They are, your Honor.

1  BY MR. GOLDSMITH:

2  Q    What does that line mean to you?

3  A    That was the date that this form was entered into use by

4  the Government.

5  Q    But this particular copy of the form, can you tell what

6  date that the person who filled it out signed it?

7  A    Yes.

8  Q    What was that date?

9  A    1991 July -- I can't see the day, but it's July of 1991.

10         July 11th of 1991.

11 Q    Where is that on the form?

12 A    That's written in under the lines ascribed on the form.

13 Q    Now, moving up in the form, at the top of the form, it

14 has the space for the name and address of the person signing

15 the affidavit and then that person says he or she is or is not

16 a citizen of the United States.

17         Do you see where I'm looking at?

18 A    Yes.

19 Q    Could you please read the next portion of the affidavit

20 for us?

21 A    That she has personally known and has been acquainted in

22 the United States with Baljit Singh, the applicant above

23 mentioned.  That to his or her personal knowledge the

24 applicant has resided in the United States as follows, and

25 104-40 41st Avenue, Corona, New York, 11368 from November of

M. Shatzkamer - Redirect / Goldsmith          127

1   '81 until June of '87 and 70B Daytone Drive, Edison, New

2   Jersey from July of '87 to the present.

3   Q    Now, does any part of this form indicate what dates the

4   person filling it out should put in those spaces, the space

5   marked month and year?

6   A    No.

7   Q    The other affidavit that you looked at yesterday is now

8   marked Government Exhibit 2B.

9            (The above-referred to exhibit was published.)

10  Q    First, if you look at the bottom of it, the notation

11  about the form and the revision that we were looking at

12  before, is this the same form as the other one?

13  A    Yes, it would appear to be so.

14  Q    Now, when was this one filled out by the person who

15  filled it out?

16  A    It appears to have been filled out June 29th of 2007.

17  Q    And even though it appears to be the same form, looking

18  up at the top, does it show anywhere on the form what dates

19  the person filling it out should put in the spaces?

20  A    No.

21  Q    Now I'm showing you page 18 of Government Exhibit 12,

22  which we looked at yesterday.  This is the affidavit that was

23  notarized by Thomas Archer.

24           (The above-referred to exhibit was published.)

25  Q    Does this affidavit have anywhere indicated on it to the

1   person who's filling it out what dates they should put in the

2   form?

3   A    Yes.

4   Q    Could you explain that for us, please?

5   A    It has in parentheses in the second part of this

6   affidavit 1981 in parentheses, close parentheses, or in

7   parentheses 1986 to 1988.

8   Q    Does any other portion of the form have similar

9   indicators?

10  A    Yes.

11  Q    Where?

12  A    Part number five which indicates the travel, 1986 is

13  preprinted on it in parentheses, as well as 1987 and 1989.

14  Q    Those years in the parentheses both in paragraph two and

15  in paragraph five, if the person filling out the years puts

16  those years in the blanks, would that support the person's

17  application?

18  A    Yes, it would.

19  Q    And in the sense that it would show that that person met

20  the requirements; is that right?

21  A    Correct.

22        MR. GOLDSMITH:  Nothing further.

23        MS. WHALEN:  Briefly, your Honor.

24

25

1    RECROSS EXAMINATION

2    BY MS. WHALEN:

3    Q    Officer Shatzkamer, you just testified that the ten

4    applications that had not yet been decided were being held in

5    abeyance because of this trial; isn't that correct?

6    A    Correct.

7    Q    And you indicated that all ten of them had notices of

8    intent to deny in those files; isn't that correct?

9    A    Correct.

10   Q    They just haven't been mailed out because they're in

11   abeyance because of this trial; isn't that correct?

12   A    Correct.

13   Q    Now, notices of intent to deny still give the applicant

14   an opportunity to respond; isn't that correct?

15   A    That's correct.

16   Q    Additionally, you were asked even if those ten -- let me

17   rephrase that, sorry.

18         If those ten are denied, the denial rate for Mr.

19   Archer's applications would still remain the same; isn't that

20   correct?

21   A    That's correct.

22   Q    And that would be zero; isn't that correct?

23   A    That's correct.

24   Q    But, again, as you testified yesterday, out of 79,000

25   applications that were filed, only 2,500 were accepted; isn't

1  that correct?

2  A    That's correct.

3  Q    And that means that you could, at any time, pull 75,000

4  applications and not find a single acceptance; isn't that

5  correct?

6  A    That's correct.

7  Q    Now, you were just asked about the affidavit of a

8  witness, the document that's been prepared by the Immigration

9  and Naturalization Service which is now part of Immigration.

10          (The above-referred to exhibit was published.)

11 Q    This affidavit was prepared for use in many programs;

12 isn't that correct?

13 A    I'm not certain.

14 Q    Well, I'm asking you, looking at the date that it was

15 prepared, it was prepared in 1978, correct?

16 A    This one appears to be prepared, the one that's on the

17 screen, 2007.

18 Q    I'm sorry.  I mean if we're looking at the very bottom

19 left-hand corner where it says "revised."

20 A    Okay.

21 Q    That was the last time this form was acted upon, I guess,

22 by the U.S. Government?

23 A    That's when it -- that's when this form went into

24 circulation for use.

25 Q    Okay.  So it went into circulation for use in 1978; isn't

1   that correct?

2   A    That's correct.

3   Q    And that's almost ten years before the legalization

4   program came into effect; isn't that correct?

5   A    That's correct.

6   Q    So, clearly, this was designed for use in other programs

7   as well; isn't that correct?

8   A    It would appear so.

9   Q    Now, there was no requirement in Legalization as to any

10  specific form of an affidavit; isn't that correct?

11  A    I'm not certain about that.

12  Q    You're not aware of any rule or any regulation that

13  required anything; isn't that correct?

14  A    Yeah, I'm not -- I'm not -- I don't know of any rule or

15  regulation governing the type of affidavit that could have

16  been submitted under the original IRCA.

17  Q    But in the interview process, which is part of IRCA, the

18  interviewer would be allowed to question the applicant about

19  the affidavit; isn't that correct?

20  A    That's correct.

21  Q    Now, you were asked about page 18 of Exhibit 12 just a

22  moment ago.

23          (The above-referred to exhibit was published.)

24  Q    Do you remember that?

25  A    Yes.

1  Q    This application has certain dates in parentheses, and

2  you noted that; isn't that correct?

3  A    Yes.

4  Q    But, yesterday --

5          MS. WHALEN:  Do you have 1A?

6          MR. GOLDSMITH:   (Handing.)

7          (The above-referred to exhibit was published.)

8  Q    I'm just asking you to look at the last page of Exhibit

9  1A which is the Form I-687 supplement.

10          You noted yesterday that basically the answers to

11  the questions were right on the form; isn't that correct?

12  A    That's correct.

13  Q    So the fact that the dates were written down on the

14  affidavit doesn't make that affidavit incorrect or fatal; does

15  it?

16  A    No, it doesn't.

17  Q    And, in fact, somebody might have been preparing the

18  affidavit based on the information that was contained on the

19  last page of the application document itself; isn't that

20  correct?

21  A    It's possible.

22  Q    Finally, you were asked, there was a mixup about what I

23  had asked you yesterday, but I had asked you yesterday about

24  applications contained in Exhibit 2 that had affidavits and

25  the people who had signed those affidavits had been convicted

M. Shatzkamer - Recross / Whalen                    133

1   of fraud; isn't that correct?

2   A    That's correct.

3   Q    And the Immigration Service then went through and tried

4   to find all of the applications that contained affidavits from

5   those people; isn't that correct?

6   A    That's correct.

7   Q    Have you been involved in the investigatory portion of

8   this case?

9   A    No.

10  Q    So you haven't interviewed any of the applicants or any

11  of their affiants; have you?

12  A    That's correct.

13            MS. WHALEN:  In further questions.

14            MR. GOLDSMITH:  No further redirect, your Honor.

15            THE COURT:  You can step down.  Thank you, very

16  much.

17            THE WITNESS:  Thank you, your Honor.

18            (Witness is excused and leaves the witness stand.)

19            THE COURT:  Do you have another witness?

20            MS. DAYANANDA:  Yes, your Honor.  The Government

21  calls Iris Ally.

22            (Iris Ally enters the courtroom and takes the

23  witness stand.)

24            COURTROOM DEPUTY:  Please raise your right hand.

25

I. Ally - Direct / Dayananda                    134

1   IRIS ALLY,

2           called by the Government, having been first duly

3   sworn, was examined and testified as follows:

4           THE COURT:  Do you understand English?

5           THE WITNESS:  Yeah.

6           THE COURT:  Have a seat.

7           COURTROOM DEPUTY:  State and spell your name for the

8   record.

9           MS. DAYANANDA:  You can have a seat.

10  DIRECT EXAMINATION

11  BY MS. DAYANANDA:

12  Q    Can you tell the jury your name?

13  A    Iris.

14  Q    Okay.

15  A    Iris Ally.

16  Q    Miss Ally, if you could just lean into the microphone a

17  little bit and pull it towards you.

18           Why don't you state your name again?

19  A    Iris Ally.

20  Q    Miss Ally, good afternoon.

21  A    Good afternoon.

22  Q    Are you nervous?

23  A    Kind of.

24  Q    Can you tell the jury how old you are?

25  A    I'm 50 years old.

I. Ally - Direct / Dayananda                    135

1   Q     Where are you from?

2   A     Guyana.

3   Q     Did you grow up in Guyana?

4   A     Yes.

5   Q     What's the national language of Guyana?

6   A     English language.

7   Q     Can you tell the jury your schooling?

8   A     It's primary school.

9   Q     Primary school.  What grade did you get to?

10  A     Third standard.

11  Q     And after third standard, did you continue?

12  A     No.

13  Q     Do you know how to read in English?

14  A     Not so well.

15  Q     Can you write in English?

16  A     Yes.

17  Q     Now, in Guyana, were you working?

18  A     No.

19  Q     Are you married?

20  A     At that time, yes.

21  Q     Who were you married to?

22  A     Mohammad Ally.

23  Q     Are you now divorced?

24  A     Yes.

25  Q     What year did you get divorced?

1   A    About four or five years now.

2   Q    Do you have any children, Miss Ally?

3   A    Yes.

4   Q    How many children?

5   A    Two children.

6   Q    How old are they?

7   A    One is 15, one is 13 plus.

8   Q    Where are they now?

9   A    They in Guyana.

10  Q    Who do they live with?

11  A    My husband's sister.

12  Q    Miss Ally, can you tell the jury what year you came to

13  the United States?

14  A    That's 2002.

15  Q    And why did you come to the U.S.?

16  A    Okay.  Because it's no job and it's, be honest, it's

17  racialism.

18  Q    What do you mean?

19  A    Okay.  With the Indian and the natives.

20  Q    Were you able to find work?

21  A    Not at that time.

22  Q    When you left Guyana, where was your husband?

23  A    He was in the United States.

24  Q    And how old were your children at that time when you

25  left?

1  A    My children, my daughter, like about six years, and my

2  son was younger, like four years or so.

3  Q    Before 2002, had you ever come to the United States

4  before?

5  A    No, never.

6  Q    Now, can you explain to the jury how you came to the

7  United States, how you entered the country?

8  A    Okay.  I went -- it was a boat cruise I was coming on.  I

9  sleep on a boat.

10 Q    When you say a boat cruise, can you explain how you got

11 on the boat cruise?

12 A    Okay.  I was hiding on the boat.

13        MS. WHALEN:  I'm sorry?

14 Q    Did you say you were hiding on the boat, Miss Ally?

15 A    Yes.

16 Q    Where were you hiding on the boat?

17 A    Okay.  I was hiding on the boat, it was on the benches.

18 Q    And where did the boat leave from in Guyana?

19 A    Guyana.

20 Q    And where did it end up?

21 A    In Canada.

22 Q    Where in Canada?

23 A    Toronto.

24 Q    Now, the trip from Canada to Toronto, how long did that

25 take?

1   A    Like five hours.

2   Q    Five hours?

3   A    Yeah.

4   Q    Not days?

5   A    Sorry.

6   Q    That's okay.

7   A    Five days, sorry.

8   Q    That's okay.

9        When you got to Canada, what happened there?

10  A    Well, when I went in Canada, I had a niece, she's living

11  there.  I stayed by her for some days, like two days or so on.

12  Q    Then at some point, did you come into the United States?

13  A    Yes.

14  Q    Can you tell the jury how you did that?

15  A    Well, I came over with a car.

16  Q    Did you come as a passenger in the car?

17  A    No, I was on the -- in the trunk of the car.

18  Q    And this whole trip from Guyana to the U.S. did you pay

19  someone for that trip?

20  A    Yeah.

21  Q    How much did you pay?

22  A    Four thousand dollars.

23  Q    Is that U.S. dollars?

24  A    Yes.

25  Q    How did you get that money?

I. Ally - Direct / Dayananda                                   139

1    A    Well, my husband that time, he pay that money for me.

2    Q    Now, you said your husband, he was already here in New

3    York?

4    A    Yes, he ...

5    Q    Now, once you were in New York, what type of work did you

6    do?

7    A    I -- first I, when I came over here, I do baby-sitter.  I

8    work for one hundred and thirty dollars per week.

9    Q    And after baby-sitting work, what type of work did you

10   find.

11   A    I work with Sylvia Bard.  I was home care, taking care of

12   her for five years.

13   Q    You mentioned her name, Sylvia Bard.

14        How old was she?

15   A    At that time, she was -- well, she die in 96.

16   Q    She died at the age of 96?

17   A    Yeah.

18   Q    You cared for her for five years, you said?

19   A    Yes.

20   Q    And when did that work end?

21   A    Twenty-first of December because she's passed away.

22   Q    This last December?

23   A    Yes.

24   Q    Are you looking for work now?

25   A    Oh, yes.  Presently now, yes.

I. Ally - Direct / Dayananda                    140

1  Q    Now, the money that you earn, are you paying taxes on

2  that?

3  A    Yes, of course.

4  Q    Did you send money home to Guyana?

5  A    Of course, yes.

6  Q    How often?

7  A    Every month.

8  Q    And since 2002, have you gone home to Guyana?

9  A    No.

10 Q    When is the last time you saw your children?

11 A    2002.

12 Q    Miss Ally, can you tell the jury what your immigration

13 status is here?  Are you here legally, or are you here

14 illegally?

15 A    No, illegally.

16 Q    Do you have a work permit now?

17 A    Yes.

18 Q    Who gave you that work permit?

19 A    I got it when I started paperwork.

20 Q    Did you start the paperwork for this case; is that right?

21 A    Yes.  Yes.

22 Q    Now, are you testifying today as part of an agreement

23 with the Government?

24 A    Yes.

25 Q    You're going to have to say it out loud because she has