UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

| | |
|---|---|
| UNITED STATES OF AMERICA, | Docket No. 08-CR-0288 (SJ) |
| - against - | **SUPPLEMENTAL DECLARATION IN SUPPORT OF MOTION FOR** |
| THOMAS ARCHER, | |
| Defendant-Appellant. | **BAIL PENDING APPEAL** |

------------------------------------------------------------------------X

**JONATHAN I. EDELSTEIN**, an attorney admitted to practice in the courts of the State of New York and in this Court, declares under penalty of perjury pursuant to 18 U.S.C. § 1746 that the following is true and correct to the extent of his knowledge:

1. I am the attorney for the defendant in the above captioned matter and as such am fully familiar with the facts and circumstances thereof. I make this Declaration in further support of defendant's motion for release pending appeal pursuant to 18 U.S.C. §§ 3143(b) and 3145(c).

2. In particular, in light of the continued document inspection that my associates and I undertook yesterday, I wish to make certain corrections, clarifications and supplementation to the facts alleged in the previously filed Memorandum of Law.

3. In the Memorandum, I identified "Surinder Singh" as the client who supported his LULAC application with a photograph of himself in Bear Mountain Park in 1981. In fact, that client was not Surinder Singh but was instead Anjum Naveed. Indeed, not only did Mr. Naveed submit a photograph showing his obviously-younger-looking self at Bear Mountain, but also submitted a 1983 picture from Six Flags and a *date-stamped* 1984 photo from the Air and Space Museum.

-1-

4. It should be noted that Mr. Naveed's application was denied, in pertinent part, because he claimed to have entered the United States without inspection but there was "no evidence of such entry." Given the nature of entry without inspection, it is unlikely that anyone would be able to come up with documentary evidence of such a border crossing. Several other A-files also reflect that applications were denied in part because of the applicant's failure to document being smuggled across the border.

5. Additionally, the examiner who interviewed Mr. Naveed noted that, according to a G-325 form, he was listed as a student in Pakistan until 1986. In fact, as Mr. Naveed pointed out in his post-interview letter, the date on the form was "1980" and the examiner, as often happens, had mistaken the digit 0 for 6.

6. It thus appears that Mr. Naveed's application may well have been truthful and that it was denied, not due to fraud, but because of the agency's exacting standards of corroboration.[1] This also provides some justification for why Mr. Archer would say that his clients were being "messed with."[2]

---

[1] The immigration history of Sarvjit Singh, an alleged unindicted co-conspirator in this case, bears comparison with the LULAC files. Mr. Singh originally applied for legalization as an agricultural worker, and his application was denied for insufficient corroboration. On appeal, the agency found that the proof submitted by him – principally a "fill in the blank" affidavit – *was* sufficient to meet his burden. He was given legal status and later naturalized. Thus, the agency's rejection of "fill in the blank" affidavits in Mr. Archer's cases is proof not of fraud but of an increase in its corroboration standards.

[2] The client originally identified in the Memorandum – Surinder Singh, file no. A93 438 580 - may also have submitted a truthful application. His application was denied, in pertinent part, because his supporting affidavits were uncorroborated and because he was using an interpreter despite claiming to have lived in the United States for 25 years. With respect to the latter ground, the hearing officer was disregarding (a) the way that immigrants who live in insular ethnic neighborhoods are often able to live for decades without needing to learn English, and (b) the fact that even an immigrant with some English skills may feel more comfortable with an interpreter when

7. Second, as discussed yesterday with AUSA Soumya Dayananda, the representation that Mr. Archer attended "more than 30" interviews with his clients was based on an estimate provided by him. Through my independent examination of the A-files, however, I have identified at least 20 cases in which Mr. Archer appears to have attended interviews with his clients.[3] With the exception of Abdul Qudeer,[4] my basis for believing that Mr. Archer attended these interviews is that (a) each file contains either interviewer's notes, a denial letter indicating that an interview occurred, or both; and (b) the files do not contain the signed waiver forms given to applicants who appear and consent to be interviewed without counsel.

8. Because I do not yet have copies of the documents in question, my notes may not be 100 percent accurate. By the same token, however, I have not yet combined my notes with those of my associates, so it may well be that Mr. Archer attended more interviews than are reflected here. His estimate of 30 interviews, whether or not precisely accurate, is at least close to the mark.

9. Yesterday's examination also yielded additional files that are either likely to have been truthful or, if fraud occurred, clearly did not involve any falsification by Mr. Archer. In the

---

attending an official interview. Moreover, in an effort to corroborate his presence in the United States, Mr. Singh submitted further affidavits after the interview took place. While this application may not have met the agency's high standards, it certainly cannot be simply assumed to be fraudulent.

[3] These cases are: Surinder Singh, Gurdip Singh, Muhammad Saleem, Mumammad Munir, Rizwan Khan, Afzal Shaheen, Bihari Thaker, Harbhajan Singh, Gurucharan Bandari, Wiqar Mir, Anjum Naveed, Paramjit Lal, Luis Sarmiento, Balkar Singh, Tariq Butt, Manuel Noronha, Chhot Singh, Shaikh Abdul Waheed, Shan Chand, and Abdul Qudeer.

[4] In Mr. Qudeer's case, the file reflects that the application was denied for failure to appear; however, an affidavit exists from Mr. Archer reflecting that he appeared with his client on September 27, 2004; that the interview was rescheduled by the agency and then rescheduled again; and that he ultimately was not provided with a new date.

interest of brevity, I will not highlight all these files herein.  However, I direct the court's attention to the application of Wiqar Mir, who provided letters from employers confirming his employment in the United States since April 1981, appeared for his interview, and gave statements consistent with his application.  This application was later deemed abandoned, apparently because the agency wanted to schedule a further interview with Mr. Mir's present wife and was unable to accommodate his requests to adjourn.  However, there is no basis to assume without further proof that the application was fraudulent; indeed, the likelihood is quite the opposite.[5]

10. A horse of a different color is Daljit Singh.  Mr. Singh filed a LIFE legalization application (the precursor to LULAC) in 1991, represented by the law office of Edwin Rivera, in which he claimed to have entered the United States in 1981.  Later, in 1994, he became a cooperating witness in "Operation Moraine," an investigation of immigration fraud similar to the alleged scheme in the instant case.  As part of his cooperation, he gave a sworn statement that he had really entered the United States in 1991, and that he had paid a female clerk in Mr. Rivera's office $1500 to file the LIFE application.  A decade later, however, Daljit Singh went to Mr. Archer's office and filed a LULAC application which again gave the 1981 date of entry.

11. Clearly, this application was fraudulent, but given Mr. Singh's background as a *cooperating witness* and the fact that the same date of entry had been placed on his earlier application, it is plain that the fraudulent information came from him and not from Mr. Archer.  In the absence of any evidence that Mr. Archer knew of Daljit Singh's background or the disposition of the prior application, defendant Archer's role in that case was that of dupe rather than that

---

[5] Again, the Mir case is *not* an "attorney-shopping" file.

of criminal.[6]

12.     Accordingly, for the reasons set forth above and in the Memorandum of Law, this Court cannot simply assume, either for Sentencing Guideline purposes or in evaluating the sufficiency of the evidence, that all the 170-odd A-files represent fraud in which Mr. Archer participated. Nor can such fraud be inferred from statistics alone. This Court should thus find that, at minimum, "substantial issues" exist for appeal that support a grant of bail.

**WHEREFORE**, this Court should issue an order granting the instant motion in its entirety and granting such other and further relief as it may deem just and proper.

Dated: New York, NY
       November 16, 2010

/s/
JONATHAN I. EDELSTEIN

---

[6] There are other applicants who are clearly no strangers to immigration fraud. Mohammad Mumtaz, for instance, filed two fraudulent marriage applications (one explicitly denied on the ground of fraud) and one asylum application prior to being represented by Mr. Archer, and filed a *third* fraudulent marriage application *after* his LULAC case was denied. Another applicant, Bihari Thaker, was found to have previously engaged in alien smuggling under another name, and filed a *pro se* notice of appeal from the LULAC denial denying the alien smuggling and stating that he "did live in the United States since November 1980." Again, it cannot be said, without further proof, that any fraud in these applications originated with Mr. Archer or even that it took place with his acquiescence.